T.C. Memo. 2013-67

UNITED STATES TAX COURT

FREDRIC A. GARDNER AND ELIZABETH A. GARDNER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12016-06, 11009-07.            Filed March 11, 2013.

<u>Scott W. Gross</u>, for petitioners.

<u>Chris J. Sheldon</u> and <u>Meredith L. Stuart</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income tax as follows:

[*2]

|  | | Additions to tax | | |
| --- | --- | --- | --- | --- |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654(a) |
| 2002 | $34,982 | $7,871 | To be determined[1] | $1,169 |
| 2003 | 76,076 | 17,117 | To be determined | 1,991 |
| 2004 | 99,261 | 22,334 | To be determined | 2,881 |

[1] The sec. 6651(a)(2) addition to tax is 0.5% of the amount of tax shown on the return, with an additional 0.5% per month during which the failure to pay continues, up to a maximum of 25%. In the notices of deficiency respondent did not calculate the amounts of the sec. 6651(a)(2) additions to tax for 2002 to 2004 because the period necessary to support the assertion of the maximum penalty amount under sec. 6651(a)(2) had not yet been attained.

The issues for decision as to all years in issue are: (1) whether petitioners must include in their gross income the amounts respondent determined using the bank deposits method; (2) whether petitioners are liable for self-employment tax under section 1401; and (3) whether petitioners are liable for additions to tax under sections 6651(a)(1)[1] and (2) and 6654(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. At the time they filed their petition, petitioners resided in Arizona.

----

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All amounts are rounded to the nearest dollar.

**[\*3]** Petitioners, husband and wife, attended Christ for the Nations Bible College together in Dallas, Texas, from 1976 to 1978. In 1978 they received associate's degrees in theology and began operating Maranatha Enterprises, Inc., d.b.a. Cornerstone Christian Center, a full-service Christian bookstore in Phoenix, Arizona. The bookstore struggled financially in its later years and ran into trouble with the Internal Revenue Service (IRS), which ultimately resulted in the assessment of tax liabilities against petitioners individually. In 1992 petitioners closed the bookstore. That was also the last year they filed a Federal income tax return.

## I.     Formation of Bethel Aram Ministries

In 1993 petitioners formed Bethel Aram Ministries (BAM), an unincorporated association in Arizona organized to be an "ecclesiastical church ministry".[2] On March 3, 1999, petitioners each signed a document entitled "vow of poverty" declaring their intent to "divest * * * [themselves] from earnings or wages from Bethel Aram Ministries". The vows of poverty stated that BAM would provide for petitioners' needs as pastors of the church ministry. Petitioners then transferred all of their assets, including title to their home, to BAM. On

---

[2] They did not file a Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code, with the IRS.

[*4] September 27, 2001, Mrs. Gardner filed articles of incorporation with the State of Nevada for "THE OFFICE OF PRESIDING HEAD PROPHETESS of Elizabeth A. Gardner after The Order of the Lord Jesus Christ, the High Priest and King after the Order of Melchizedek, and her Successors, a corporation sole"[3] of BAM.

## II.     Control Over BAM

Mr. Gardner held himself out as an "Elder, Teacher, Certified Estate & Financial Planner" of BAM.  Mrs. Gardner held herself out as a "Prophetess, Teacher, Pastor, and Certified Paralegal" of BAM.  They together had unfettered control over BAM's operations and finances.[4]  They had the same telephone number as BAM and communicated with others on behalf of BAM.  Mrs. Gardner did "all the writing * * * on behalf of the church", and Mr. Gardner handled its books and records.  They did not have any personal bank accounts; instead, they used BAM's business accounts at Community First Bank, Bank One, and Wells

---

[3] The IRS has defined a corporation sole as "a corporate form authorized under certain state laws to enable bona fide religious leaders to hold property and conduct business for the benefit of the religious entity."  Rev. Rul. 2004-27, 2004-1 C.B. 625, 626; see also Chambers v. Commissioner, T.C. Memo. 2011-114, slip op. at 36.

[4] The record contains inconsistent information about a few so-called elders of BAM during the years in issue.  We find that these elders had no control over BAM's operations or finances.

[**5**] Fargo as their own.  They were the sole signatories on the accounts and used funds from the accounts to pay their personal expenses, including groceries, clothing, medical care, utilities, housing, dining at restaurants, and food and veterinary care for their dog.

III.    BAM's Operations

During the years in issue petitioners traveled across the country promoting their services in setting up corporations sole, limited liability companies (LLCs) and "canon law" trusts.[5]  They advertised on the Internet and spoke at meetings, seminars, and conferences about the benefits of a corporation sole and the differences between a corporation sole and an organization that is exempt from tax under section 501(c)(3).  In her promotional literature Mrs. Gardner claimed the benefits of a corporation sole included:  (1) "The government is not able to interfere in any way"; (2) "All church workers are no longer classified as employees, but considered as ministers of the gospel"; (3) "There are no filing requirements of any kind"; and (4) "There are no withholding or self-employment taxes or income tax with corporation sole".  She further claimed that "[i]f the IRS makes inquiries concerning the church/ministry, notify them that you are a

_____

    [5] BAM did not have any members in 2002 and 2003 and in 2004 it had none until August.

[*6] corporation sole. This will end their inquiry. Do not give them any information, except that you are a corporation sole!"

Petitioners listed the cost of their services on so-called donation sheets. The donation sheets instructed customers to "please make separate checks out to": (1) for a corporation sole, BAM for $1,200, Carol Spackman[6] for $80, and the State of Nevada for $85; (2) for an LLC, BAM for $700, Ms. Spackman for $80, and the State of Nevada for $235; and (3) for a trust, BAM for $1,000.[7] Petitioners also entered into so-called contribution agreements which provided that customers would make a contribution to BAM in exchange for "Consulting Assistance concerning Corporation Sole and/or Asset Protection/Estate Planning and their designated document(s)".

Petitioners established over 300 corporations sole and approximately 18 LLCs.[8] They deposited the payments they received in consideration therefor into BAM's bank accounts. The deposits included payments from religious leaders

---

[6] Ms. Spackman served as the registered agent in Nevada for most of the corporations sole petitioners established. Petitioners used whomever gave them the lowest price.

[7] Petitioners also accepted payments by credit card.

[8] The record does not reflect how many corporations sole or LLCs petitioners established during the years in issue nor how many trusts they established.

**[*7]** and from people in other professions, including two chiropractors, a realtor, and a carpet salesman. Petitioners also deposited into BAM's bank accounts payments they received from an insurance salesman in exchange for customer referrals.

On March 21, 2008, an injunction was entered in the U.S. District Court for the District of Arizona enjoining petitioners from, among other things, "[o]rganizing, promoting, marketing, or selling corporations sole or any tax shelter, plan or arrangement, that advises, assists, or encourages taxpayers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities". United States v. Gardner, 2008 WL 906696, at *6 (D. Ariz. 2008), aff'd, 457 Fed. Appx. 611 (9th Cir. 2011). The District Court found that petitioners participated in an abusive tax shelter program promising unwarranted tax benefits from corporations sole. The injunction was affirmed on appeal.

IV.     Petitioners' Tax Returns

Petitioners failed to file tax returns for the years in issue and refused to provide to respondent's revenue agent BAM's books and records during audit.[9]

---

[9] Petitioners instead provided to the revenue agent a copy of Mrs. Gardner's promotional literature.

[*8] Consequently, the revenue agent obtained bank records from BAM's Wells Fargo bank account through a third-party summons. He conducted a bank deposits analysis by which he examined all of the transactions, deposits, and disbursements occurring in the account during the years in issue and identified taxable and nontaxable deposits.[10] He determined that petitioners had gross bank deposits of $101,722, $219,481, and $281,232 and net taxable deposits[11] of $100,070, $217,973, and $235,679 for 2002, 2003, and 2004, respectively. On March 21, 2006, respondent issued separate notices of deficiency to petitioners for 2002 and 2003. On March 30, 2007, respondent issued separate notices of deficiency to petitioners for 2004. Petitioners timely petitioned the Court for redetermination of the deficiencies.

OPINION

I.      Presumption of Correctness

As a general rule, the Commissioner's determination of a taxpayer's liability in the notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is improper. See Rule 142(a); Welch v.

---

[10] The revenue agent did not perform a bank deposits analysis for the Community First or Bank One accounts.

[11] The revenue agent calculated the net taxable deposits by subtracting what he determined to be nontaxable deposits from the gross deposits.

[*9] Helvering, 290 U.S. 111, 115 (1933).  In the Court of Appeals for the Ninth

Circuit, to which an appeal of this case would lie absent a stipulation to the

contrary, see sec. 7482(b)(1)(A), (2), the presumption of correctness does not attach

in cases involving unreported income unless the Commissioner first establishes an

evidentiary foundation linking the taxpayer to the alleged income-producing activity,

see Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), rev'g

67 T.C. 672 (1977).  The requisite evidentiary foundation is minimal and need not

include direct evidence.  See Banister v. Commissioner, T.C. Memo. 2008-201,

aff'd, 418 Fed. Appx. 637 (9th Cir. 2011).

Once the Commissioner produces evidence linking the taxpayer to an

income-producing activity, the burden shifts to the taxpayer "to rebut the

presumption of correctness of respondent's deficiency determination by establishing

by a preponderance of the evidence that the deficiency determination is arbitrary or

erroneous."  Petzoldt v. Commissioner, 92 T.C. 661, 689 (1989); see also Hardy v.

Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97.

Respondent has established the requisite minimal evidentiary foundation

linking petitioners with an income-producing activity for all years in issue by

introducing evidence that they promoted their services in setting up corporations

**[*10]** sole, LLCs, and trusts and deposited the payments they received in consideration therefor into BAM's bank accounts. Therefore, petitioners bear the burden of proving the deficiency determinations arbitrary or erroneous. Petitioners have neither claimed nor established that they satisfy the requirements of section 7491(a) to shift the burden of proof to respondent.

## II. Petitioners' Unreported Income for the Years in Issue

### A. Bank Deposits

Gross income includes "all income from whatever source derived". Sec. 61(a). A taxpayer must maintain books and records establishing the amount of his or her gross income. Sec. 6001. If a taxpayer fails to maintain and produce the required books and records, the Commissioner may determine the taxpayer's income by any method that clearly reflects income. See sec. 446(b); Petzoldt v. Commissioner, 92 T.C. at 693; sec. 1.446-1(b)(1), Income Tax Regs. The Commissioner's reconstruction of income "need only be reasonable in light of all surrounding facts and circumstances." Petzoldt v. Commissioner, 92 T.C. at 687.

The bank deposits method is a permissible method of reconstructing income. See Clayton v. Commissioner, 102 T.C. 632, 645 (1994); see also Langille v. Commissioner, T.C. Memo. 2010-49, aff'd, 447 Fed. Appx. 130 (11th Cir. 2011). Bank deposits constitute prima facie evidence of income. See

[*11] Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The Commissioner need not show the likely source of a deposit treated as income, but the Commissioner "must take into account any nontaxable source or deductible expense of which * * * [he] has knowledge" in reconstructing income using the bank deposits method. See Clayton v. Commissioner, 102 T.C. at 645-646. However, the Commissioner need not follow any "leads" suggesting that a taxpayer has deductible expenses. DiLeo v. Commissioner, 96 T.C. 858, 872 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

After the Commissioner reconstructs a taxpayer's income and determines a deficiency, the taxpayer bears the burden of proving that the Commissioner's use of the bank deposits method is unfair or inaccurate. See Clayton v. Commissioner, 102 T.C. at 645; DiLeo v. Commissioner, 96 T.C. at 871-872. The taxpayer must prove that the reconstruction is in error and may do so, in whole or in part, by proving that a deposit is not taxable. See Clayton v. Commissioner, 102 T.C. at 645.

Respondent introduced credible evidence that petitioners refused to produce BAM's books and records during audit. Therefore, we find that it was reasonable for respondent to use an indirect method, i.e., the bank deposits method, to reconstruct petitioners' income.

**[\*12]** B.    <u>Whether Petitioners' Bank Deposits Constituted Taxable Income</u>

Section 61(a) defines gross income as "all income from whatever source derived," including "[c]ompensation for services, including fees, commissions, fringe benefits, and similar items" and "[g]ross income derived from business".  The definition is construed broadly and extends to all accessions to wealth, clearly realized, over which the taxpayer has complete control.  <u>See</u> <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 431 (1955).  As the Supreme Court explained, a gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it."  <u>Rutkin v. United States</u>, 343 U.S. 130, 137 (1952).

When the Commissioner reconstructs a taxpayer's income using the bank deposits method, the Commissioner may include in gross income "deposits into all accounts over which the taxpayer has dominion and control, not just deposits into the taxpayer's personal bank accounts."  <u>Chambers v. Commissioner</u>, T.C. Memo. 2011-114, slip op. at 18; <u>see also</u> <u>United States v. Goldberg</u>, 330 F.2d 30, 38 (3d Cir. 1964); <u>Davis v. United States</u>, 226 F.2d 331, 334-335 (6th Cir. 1955); <u>Price v. Commissioner</u>, T.C. Memo. 2004-103, slip op. at 25; <u>Cohen v. Commissioner</u>, T.C. Memo. 2003-42, slip op. at 9; <u>Woods v. Commissioner</u>, T.C. Memo. 1989-611, <u>aff'd without published opinion</u>, 929 F.2d 702 (6th Cir. 1991).  A taxpayer

**[\*13]** has dominion and control when the taxpayer is free to use the funds at will. Rutkin, 343 U.S. at 137. Use of funds for personal purposes indicates dominion and control. Woods v. Commissioner, T.C. Memo. 1989-611, 1989 Tax Ct. Memo LEXIS 611, at \*12-\*13.

The Court has extended this general principle to situations where a taxpayer has dominion and control over an account titled in the name of a church or other religious organization. For example, in Woods we stated:

> It is not necessary to disregard the separate existence of the church or to challenge the tax status of the church as an entity in order to sustain respondent's determinations in this case. Whether they were entitled to the funds or embezzled the funds from the church, petitioners exercised complete dominion and control over deposits into the various bank accounts that were the basis of respondent's determination. \* \* \*

Id., 1989 Tax Ct. Memo LEXIS 611, at \*12. Similarly, in Chambers v. Commissioner, T.C. Memo. 2011-114, slip op. at 23, we held that all deposits into church bank accounts were properly includible in the taxpayers' gross income because the taxpayers "fully controlled the church accounts, used money in those accounts at will, including to pay personal expenses, and were not accountable to anyone in their congregation for their use of the church funds."

We recently decided an unreported income case involving a corporation sole that bears a striking resemblance to the instant case. See Gunkle v. Commissioner,

**[\*14]** T.C. Memo. 2012-305. In <u>Gunkle</u> the taxpayers attended a Church Leadership Conference in 2002. Petitioners, Fredric and Elizabeth Gardner, were invitees to the conference, and Mrs. Gardner was a speaker. Thereafter, the Gunkles requested that the Gardners help them establish a corporation sole. On February 25, 2004, the "Office of Presiding Pastor, Bruce W. Gunkle, And His Successors, A Corporation Sole," was formed in Nevada, and the following week the Gunkles signed a vow of poverty stating that their church would deposit a check in the church pastoral account every two weeks according to the their needs. The Gunkles used funds in the pastoral account to pay living and personal expenses but did not report the deposits into the account (other than Social Security payments) in income.[12]

The Gunkles argued that the deposits were nontaxable gifts and that their vows of poverty insulated them from taxation on the compensation they received for their services to their church. We stated that "[p]ayments or benefits received in exchange for services rendered by individuals and not on behalf of a separate and distinct principal are taxable to the individuals." <u>Id.</u> at \*7 (citing <u>Pollard v. Commissioner</u>, 786 F.2d 1063, 1065-1066 (11th Cir. 1986), <u>aff'g</u> T.C. Memo. 1984-536, <u>Stephenson v. Commissioner</u>, 79 T.C. 995, 999-1002 (1982), <u>aff'd</u>, 748

_____

[12] The Gunkles also reported Mr. Gunkle's military pension in income.

**[\*15]** F.2d 331 (6th Cir. 1984), McGahen v. Commissioner, 76 T.C. 468, 478-479 (1981), aff'd without published opinion, 720 F.2d 664 (3d Cir. 1983), and Yoshihara v. Commissioner, T.C. Memo. 1999-375). We further stated that "[t]axpayers may not self-declare an exemption from income tax by the simple expediency of taking a vow of poverty." Gunkle v. Commissioner, at *7 (citing McGahen v. Commissioner, 76 T.C. at 478-479).

We found that the payments deposited into the pastoral account were compensation to the Gunkles for the services they performed as pastors of their church. We further found that the Gunkles did not receive payments as agents of their church; to the contrary, payments were made for their sole benefit. We held that the Gunkles had to include the deposits, as reduced by respondent's concessions, in income.

Petitioners make arguments very similar to those the Gunkles made. Petitioners argue that the deposits into BAM's bank accounts do not constitute taxable income to them because (1) the deposits were gifts or donations to a legitimate church; and (2) they took vows of poverty and acted as agents of BAM.[13] Both of their arguments are unavailing.

---

[13] Petitioners also argue that $67,000 of the deposits in 2003 and $170,000 to $171,000 of the deposits in 2004 are nontaxable credit card cash advances. Mr.

(continued...)

**[\*16]** In Commissioner v. Duberstein, 363 U.S. 278, 285 (1960), the Supreme Court stated that a gift arises out of a transfer resulting from a "'detached and disinterested generosity,' * * * 'out of affection, respect, admiration, charity or like impulses.'" (Citations omitted.) Likewise, "donations to a charitable organization are deductible only if made out of a 'detached and disinterested generosity.'" Stiebling v. Commissioner, T.C. Memo. 1994-233 (citing Allen v. United States, 541 F.2d 786, 787 (9th Cir. 1976)), aff'd without published opinion, 113 F.3d 1242 (9th Cir. 1997). We find that the deposits into BAM's bank accounts were compensation to petitioners for the services they performed in setting up corporations sole, LLCs, and trusts. The deposits were not gifts or donations as petitioners contend--they represented a quid pro quo exchange; i.e., the payors were receiving petitioners' services in consideration for their payments. Accordingly, the deposits are includible in petitioners' gross income under section 61.

---

[13](...continued)
Gardner identified some deposits at trial that he claimed were cash advances. He testified that he had "different credit card limits on different credit cards" and was able to secure such large cash advances by transferring balances "from one credit card to the next". However, his testimony was unreliable and at times contradicted by his prior statements. Furthermore, petitioners did not offer any evidence (such as credit card statements) to corroborate Mr. Gardner's testimony. We need not and do not accept his self-serving testimony. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

[*17] Equally unpersuasive is petitioners' argument that the deposits are tax-exempt income of BAM because they took vows of poverty and acted as agents of BAM. See McGahen v. Commissioner, 76 T.C. at 478-479. Like the taxpayers in Woods and Gunkle, petitioners had unfettered control over their church's bank accounts. Petitioners did not have any personal bank accounts; instead, they used BAM's accounts as their own and for their own benefit. They deposited the payments they received from setting up corporations sole, LLCs, and trusts into BAM's accounts and withdrew funds from BAM's accounts to pay their personal expenses. Furthermore, there is no evidence that petitioners were accountable to anyone for the funds in BAM's accounts. Because petitioners exercised dominion and control over BAM's accounts, all taxable deposits into those accounts are includible in their gross income. See Gunkle v. Commissioner, T.C. Memo. 2012-305; Chambers v. Commissioner, T.C. Memo. 2011-114; Woods v. Commissioner, T.C. Memo. 1989-611.

C.     Reconstructing Petitioners' Income Using the Bank Deposits Method

Under the bank deposits method the Commissioner may assume that all money deposited into a taxpayer's account is taxable income. DiLeo v. Commissioner, 96 T.C. at 868. However, as noted supra, the Commissioner must take into account any nontaxable source of income or deductible expense of which

[*18] he has knowledge.  Id.  The Commissioner's use of the bank deposits method is not invalidated simply because some of the calculations are in error.  See id.  Having decided that respondent acted reasonably in using an indirect method to reconstruct petitioners' income and having rejected petitioners' arguments regarding whether such income constituted taxable income, we now review respondent's calculations of petitioners' taxable income for the years in issue.

Respondent's revenue agent determined that petitioners made gross deposits into BAM's Wells Fargo bank account of $101,722 for 2002, $219,481 for 2003, and $281,232 for 2004.  The revenue agent determined that the gross deposits included nontaxable deposits of $1,652 for 2002, $1,508 for 2003, and $45,553 for 2004.[14]  After subtracting the nontaxable deposits from the gross deposits, the revenue agent determined that petitioners made net taxable deposits of $100,070 for 2002, $217,973 for 2003, and $235,679 for 2004.  However, in the notices of deficiency respondent determined that petitioners had larger amounts of unreported income--$101,616 for 2002, $218,320 for 2003, and $281,232 for

---

[14] The revenue agent erroneously listed the nontaxable deposits for 2003 as $1,378 and for 2004 as $45,352 on the summary page of his workpapers; however, an analysis of his workpapers reveals that he subtracted from the gross deposits $1,508 for 2003 and $45,553 for 2004 in computing the net taxable deposits.

**[\*19]** 2004. Respondent has not introduced any evidence to explain the differences in the amounts of unreported income between the revenue agent's workpapers and the notices of deficiency.[15] Furthermore, we find that the revenue agent properly reconstructed petitioners' bank deposits for 2002, 2003, and 2004, with the exception of three additional deposits for 2004 which we believe are also nontaxable.[16] Accordingly, we find that petitioners had unreported income of $100,070 for 2002, $217,973 for 2003, and $235,542 for 2004,[17] and they must include these amounts in gross income.

## III. Self-Employment Tax

A taxpayer's self-employment income is subject to self-employment tax. Sec. 1401(a) and (b). Self-employment tax is assessed and collected as part of the income tax, must be included in computing any income tax deficiency or overpayment for the applicable tax period, and must be taken into account for estimated tax purposes. Sec. 1401; see also sec. 1.1401-1(a), Income Tax Regs.

---

[15] We will give petitioners the benefit of the doubt as to the discrepancies.

[16] The three deposits, $97, $18, and $22, are each identified in the revenue agent's workpapers as a "check card purchase return".

[17] We arrive at this figure for 2004 by subtracting the three additional nontaxable deposits ($97 + $18 + $22 = $137) from the amount of unreported income as determined by the revenue agent in his workpapers ($235,679 - $137 = $235,542).

**[\*20]** Self-employment income is generally defined as "the net earnings from self-employment derived by an individual". Sec. 1402(b). "The term 'net earnings from self-employment' means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions * * * attributable to such trade or business". Sec. 1402(a). Section 1402(c)(4) provides that the term "trade or business" does not include "the performance of service by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry" if an exemption under section 1402(e) is effective for the minister. See also Wingo v. Commissioner, 89 T.C. 922, 929 (1987). If the minister does not file the application for exemption within the prescribed time, the minister is liable for self-employment tax. Sec. 1402(e); see also Wingo v. Commissioner, 89 T.C. at 929-930.

Petitioners contend that they are not liable for self-employment tax because they are ordained ministers. However, they did not introduce any credible evidence to prove that they submitted a Form 4361, Application for Exemption From Self-Employment Tax for Use by Ministers, Members of Religious Orders and Christian Science Practitioners, for the years in issue that was approved by the IRS. See sec. 1.402(e)-2A, Income Tax Regs. (providing that a section 1402(e) exemption request shall be made by filing the application for exemption on Form

[*21] 4361).  Accordingly, they have failed to prove that they were exempt from self-employment tax during the years in issue.  We hold that petitioners are liable for self-employment tax with respect to the amounts of their unreported income.

IV.    Additions to Tax

A.    Burden of Proof

Respondent determined that petitioners are liable for additions to tax pursuant to sections 6651(a)(1) and (2) and 6654.  Respondent has the burden of production with respect to these additions to tax.  See sec. 7491(c).  To meet this burden, respondent must produce evidence showing that the additions to tax are appropriate.  See id.; Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once respondent satisfies this burden, petitioners have the burden of proof with respect to exculpatory factors such as reasonable cause.  See Higbee v. Commissioner, 116 T.C. at 446-447.

B.    Section 6651(a)(1)

Section 6651(a)(1) imposes an addition to tax when a taxpayer fails to file a timely return unless the taxpayer establishes that the failure was due to reasonable cause and not willful neglect.  The addition to tax is equal to 5% of the amount required to be shown as tax on the delinquent return for each month or fraction

**[*22]** thereof during which the return remains delinquent, up to a maximum addition of 25% for returns more than four months delinquent. See sec. 6651(a)(1).

Petitioners did not file a Federal income tax return for any of the years in issue. Thus, we find that respondent has met his burden of production. Petitioners have not provided any evidence indicating that their failure to file returns was due to reasonable cause. Accordingly, we hold that petitioners are liable for the addition to tax under section 6651(a)(1).

C.    Section 6651(a)(2)

Section 6651(a)(2) imposes an addition to tax for failure to timely pay the amount of tax shown on a return, unless the taxpayer establishes that the failure was due to reasonable cause and not willful neglect. The addition is calculated as 0.5% of the amount shown as tax on the return but not paid, with an additional 0.5% for each month or fraction thereof during which the failure to pay continues, up to a maximum of 25%.[18] See sec. 6651(a)(2).

---

[18] The amount of the addition to tax under sec. 6651(a)(2) reduces the amount of the addition to tax under sec. 6651(a)(1) for any month for which an addition to tax applies under both paragraphs. Sec. 6651(c)(1).

**[*23]** With respect to the section 6651(a)(2) addition to tax, the Commissioner must introduce evidence that the tax was shown on a Federal income tax return to satisfy his burden of production under section 7491(c). Cabirac v. Commissioner, 120 T.C. 163 (2003). When a taxpayer has not filed a return, the section 6651(a)(2) addition to tax may not be imposed unless the Secretary has prepared a substitute for return (SFR) that meets the requirements of section 6020(b). Wheeler v. Commissioner, 127 T.C. 200, 208-209 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008).

Section 6020(b) provides:

SEC. 6020(b). Execution of Return by Secretary.--

(1) Authority of Secretary to execute return.--If any person fails to make any return required by any internal revenue law or regulation made thereunder at the time prescribed therefor, or makes, willfully or otherwise, a false or fraudulent return, the Secretary shall make such return from his own knowledge and from such information as he can obtain through testimony or otherwise.

(2) Status of returns.--Any return so made and subscribed by the Secretary shall be prima facie good and sufficient for all legal purposes.

Because respondent is relying upon an SFR to support his determination under section 6651(a)(2), respondent must introduce evidence that an SFR satisfying the

**[\*24]** requirements of section 6020(b) was made. See Wheeler v. Commissioner, 127 T.C. at 210. Respondent has not done so.

We have addressed on several occasions what constitutes an SFR. See id. at 208-210 (discussing Phillips v. Commissioner, 86 T.C. 433, 437-438 (1986), aff'd in part, rev'd in part on another issue, 851 F.2d 1492 (D.C. Cir. 1988), Millsap v. Commissioner, 91 T.C. 926, 930 (1988), and Cabirac v. Commissioner, 120 T.C. at 170-173). In Wheeler v. Commissioner, 127 T.C. at 210, we noted that in "each of the cases discussed above, the record included the SFRs that the Commissioner contended met the requirements of section 6020(b) and/or stipulations that the SFRs had been filed." Although respondent alleged that a valid SFR was prepared for petitioners for each year in issue, respondent did not introduce the SFRs into evidence, and the parties did not stipulate that valid SFRs were made. Instead, respondent relies upon account transcripts for 2002 to 2004.[19]

Each of the account transcripts states "substitute tax return prepared by IRS" and lists a corresponding date. However, the account transcripts do not establish that the SFRs meet the requirements of section 6020(b). We find that respondent has not satisfied his burden of production under section 7491(c), and

---

[19] The record also contains Forms 4549, Income Tax Examination Changes, for 2002 to 2004.

[*25] accordingly petitioners are not liable for the additions to tax under section 6651(a)(2) for 2002 to 2004. See Wheeler v. Commissioner, 127 T.C. at 210 (finding that the Commissioner did not meet his burden of production under section 7491(c) for the section 6651(a)(2) addition to tax when he introduced a Form 4340, Certificate of Assessments, Payments, and Other Specified Matters, which contained only a "cryptic and summary reference" to an SFR); Lewis v. Commissioner, T.C. Memo. 2007-44 (finding that the Commissioner did not meet his burden of production under section 7491(c) for the section 6651(a)(2) addition to tax when he introduced the following documents: (1) a Form 4340 indicating respondent prepared an SFR on a certain date; (2) a Form 4549 pertaining to the taxpayer's year in issue; (3) an Individual Master File Tax Module; and (4) a Form 13496, IRC Section 6020(b) Certification, pertaining to the taxpayer's year in issue), aff'd, 523 F.3d 1272 (10th Cir. 2008).

D.     Section 6654

Section 6654(a) imposes an addition to tax when a taxpayer fails to pay a required installment of estimated income tax. In general, each required installment is equal to 25% of the required annual payment. Sec. 6654(d)(1)(A). The required annual payment is equal to the lesser of (1) 90% of the tax shown on the return for the taxable year (or, if no return is filed, 90% of the tax for that year), or (2) 100%

[*26] of the tax shown on the return, if any, for the preceding taxable year.  Sec. 6654(d)(1)(B).  Petitioners have not filed a Federal income tax return since 1992.  Therefore, petitioners' required annual payments for 2002, 2003, and 2004 were 90% of the tax for each of those years.  See id.; Missall v. Commissioner, T.C. Memo. 2008-258, slip op. at 7.  Respondent has met his burden of production for the section 6654 addition to tax.

Except in very limited circumstances not applicable in this case, see sec. 6654(e)(3)(B), section 6654 provides no exception for reasonable cause, Mendes v. Commissioner, 121 T.C. 308, 323 (2003).  Instead, the section 6654 addition to tax is mandatory unless the taxpayer establishes that one of the exceptions in section 6654(e) applies.  Recklitis v. Commissioner, 91 T.C. 874, 913 (1988).  Petitioners have not shown that any of the statutory exceptions under section 6654(e) applies.  Accordingly, we find that petitioners are liable for the addition to tax under section 6654.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

**[*27]** To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.