T.C. Memo. 2016-117

UNITED STATES TAX COURT

STEVEN EUGENE EDWARDS, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7329-10.                         Filed June 15, 2016.

Steven Eugene Edwards, pro se.

<u>Timothy J. Driscoll, Jr.</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined a $1,054,142 deficiency in petitioner's 2000 Federal income tax and a $790,606.50 fraud penalty under section 6663.[1]  By amended answer, respondent asserted a $202,953 increase in

_____

[1]Unless otherwise indicated, all section references are to the Internal

(continued...)

**[*2]** the income tax deficiency and a corresponding $152,214.75 increase in the fraud penalty.

After concessions, the issues for decision are: (1) whether petitioner had unreported interest income of $41,492.25;[2] (2) whether petitioner had unreported income from diverted funds of $3,174,817.80; and (3) whether petitioner is liable for a fraud penalty under section 6663.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

At the time the petition was filed, petitioner resided in North Carolina. During the taxable year 2000 petitioner was married to Marian C. Piornack (Ms. Piornack).[3] Petitioner was an owner of Magna Corp., which was a business

---

[1](...continued)
Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent determined in the notice of deficiency that petitioner and his former spouse received $76,585 of interest income in the taxable year 2000 and did not report $63,648 of this amount. Respondent concedes that $22,155.75 of the $63,648 is attributable exclusively to petitioner's former spouse and thus asserts that petitioner failed to report interest income of $41,492.25.

[3]Ms. Piornack was granted relief from joint and several liability under sec. 6015(b).

[*3] ostensibly involved in insurance sales and employee leasing.[4]  In 2000 petitioner collected health and workers' compensation insurance premiums from various employers and represented to them that they had health and workers' compensation coverage when in fact they did not.  As summarized below, petitioner failed to report significant amounts of income received during the year in issue.

Interest Income

The parties stipulate that petitioner and Ms. Piornack received interest income of $54,429.25[5] during the taxable year 2000, which accrued in bank accounts held by (1) petitioner individually and/or (2) petitioner and Ms. Piornack jointly at Englewood Bank, SouthBank, Centura Bank, and Triangle Bank.

Petitioner and Ms. Piornack reported $12,937 of interest income on their joint 2000 Federal income tax return.  Petitioner underreported his interest income by $41,492.25 (i.e., $54,429.25 – $12,937).

---

[4]Employee leasing involves the outsourcing of human resource functions, such as:  employee benefits, payroll, workers' compensation, recruiting, and training and development.

[5]The parties stipulate that petitioner and Ms. Piornack received interest income of $54,429.51.  This figure appears to be overstated by $0.26, and we have corrected this error to comport with the underlying exhibits.

**[*4]** Owl's Woods Residence

In 2000 petitioner paid for the construction of a primary residence for himself and Ms. Piornack on Owl's Woods Lane in Orange County, North Carolina (Owl's Woods residence). Petitioner paid for the construction of the Owl's Woods residence using checks drawn on a SouthBank account held in the name of Capital Marketing (Capital Marketing account).[6] Both petitioner and Ms. Piornack's names are on the Capital Marketing account along with the address of the Owl's Woods residence. Petitioner issued checks[7] to the builder of the Owl's Woods residence, Cyn-Mar Design, Inc. (Cyn-Mar), as follows:

| Date | Account | Check No. | Amount |
|------|---------|-----------|--------|
| 1/17/2000 | Capital Marketing | 2611 | $197,707.76 |
| 2/21/2000 | Capital Marketing | 2472 | 124,814.01 |
| 3/20/2000 | Capital Marketing | 2616 | 103,996.28 |
| 4/6/2000 | Capital Marketing | 2617 | 137,000.00 |
| 4/28/2000 | Capital Marketing | n/a | 159,219.00 |
| 5/10/2000 | Capital Marketing | 2620 | 238,224.06 |
| 5/26/2000 | Capital Marketing | 2621 | 189,388.50 |
| 6/15/2000 | Capital Marketing | 2624 | 181,033.82 |

---

[6]Petitioner opened the Capital Marketing account using the employer identification number from Capital Marketing Associates, Inc., a company owned by Alton Brown, an associate of petitioner's at Magna Corp.

[7]Petitioner signed each check to Cyn-Mar drawn on the Capital Marketing account.

| [*5] 7/19/2000 | Capital Marketing | 2450 | 31,414.98 |
| 9/29/2000 | Capital Marketing | 2643 | 88,315.75 |
| Total | | | 1,451,114.16 |

The construction contract designates petitioner and Ms. Piornack as the owners of the property on which Cyn-Mar built the Owl's Woods residence, but the general warranty deed designates only Ms. Piornack as grantee. Petitioner avoided titling property in his name in an effort to keep it out of the Government's reach.

Petitioner had two built-in safes and a portable safe in the Owl's Woods residence in which he stored cash. Petitioner also stored cash in a safe deposit box he maintained at Englewood Bank in Florida. Petitioner and Ms. Piornack also owned a townhouse in Florida which they used for vacation.

Sunshine Co. Commission Payments

In 2000 petitioner issued bills to, and received checks from, Sunshine Co. for commissions from the sale of workers' compensation and health insurance. According to an account ledger, Sunshine Co. issued checks payable to petitioner during the taxable year 2000 as follows:

| Date | Check No. | Amount |
| --- | --- | --- |
| 2/8/2000 | 049989 | $14,169.23 |
| 3/21/2000 | 051382 | 15,521.58 |
| 4/25/2000 | 052591 | 19,835.73 |
| 6/6/2000 | 054141 | 16,516.41 |
| 7/6/2000 | 055355 | 17,020.81 |

| | | | |
|---|---|---|---|
| **[\*6]** | 7/25/2000 | 056086 | 23,028.57 |
| | 8/22/2000 | 056949 | 22,146.94 |
| | Total | | [1]128,239.27 |

[1]The stipulation of facts calculates the sum of the above-listed amounts to be $119,337.61. No explanation is given for this discrepancy, and we have corrected this error to comport with the underlying exhibits.

These checks were payable to petitioner personally.[8]

Fidelity Group Commission Payments

In 2000 Fidelity Group issued commission checks payable to Capital Marketing as follows:

| Date | Check No. | Amount |
|---|---|---|
| 6/12/2000 | 2024 | $154,379.21 |
| 7/14/2000 | 2049 | 62,561.37 |
| 9/12/2000 | 2099 | 59,587.79 |
| Total | | 276,528.37 |

These checks were received and endorsed by petitioner and deposited into a personal account held in the names of petitioner and Ms. Piornack. Each check from Fidelity Group was classified on its face as a commission payment.

---

[8]In his petition, petitioner acknowledges that the Sunshine payments were payable to him personally and should have been reported as income.

**[*7]** <u>Carolina Green</u>

Petitioner's Roth individual retirement account is the owner of an entity named Carolina Green, Inc. (Carolina Green). Carolina Green has no business function but serves as the owner of a Bear Stearns brokerage account (Bear Stearns account). In 2000 payments were made (via wire transfer) from petitioner's Capital Marketing account to the Bear Stearns account as follows:

| Date | Originating Account | Payee | Amount |
|---|---|---|---|
| 2/8/2000 | Capital Marketing | Bear Stearns | $25,000 |
| 2/25/2000 | Capital Marketing | Bear Stearns | 70,000 |
| 3/7/2000 | Capital Marketing | Bear Stearns | 115,000 |
| 3/17/2000 | Capital Marketing | Bear Stearns | 102,000 |
| 3/27/2000 | Capital Marketing | Bear Stearns | 130,000 |
| 4/12/2000 | Capital Marketing | Bear Stearns | 119,000 |
| 4/20/2000 | Capital Marketing | Bear Stearns | 2,000 |
| 4/24/2000 | Capital Marketing | Bear Stearns | 198,000 |
| 4/26/2000 | Capital Marketing | Bear Stearns | 80,000 |
| 5/1/2000 | Capital Marketing | Bear Stearns | 75,000 |
| 5/22/2000 | Capital Marketing | Bear Stearns | 145,000 |
| 6/26/2000 | Capital Marketing | Bear Stearns | 1,000 |
| 7/13/2000 | Capital Marketing | Bear Stearns | 49,000 |
| Total | | | 1,111,000 |

Petitioner authorized each wire transfer made to the Bear Stearns account.

Petitioner also made payments to various motorcycle stores and dealerships from his Capital Marketing account as follows:

| [*8] | Date | Check No. | Payee | Amount |
|------|------|-----------|-------|--------|
| | 3/14/2000 | 2473 | Harley Davidson | $42,995 |
| | 3/14/2000 | 2475 | Twin Specialties | 50,000 |
| | 6/26/2000 | 2625 | Twin Specialties | 20,000 |
| | 8/3/2000 | 2628 | Twin Specialties | 20,159 |
| | 8/23/2000 | 2632 | Twin Specialties | 23,692 |
| | 10/25/2000 | 2644 | Twin Specialties | 25,000 |
| | 12/1/2000 | 2677 | Harley Davidson | 26,090 |
| | Total | | | 207,936 |

Petitioner signed each of the checks paid to the motorcycle companies. The Division of Motor Vehicles title history information recognizes Carolina Green as the owner of two 2000 private motorcycles and a 2000 private trailer. Ms. Piornack knew petitioner owned motorcycles, but she was unaware that he owned "around eight motorcycles" until she discovered receipts in the den of the Owl's Woods residence.

On November 5, 2001, petitioner and Ms. Piornack filed a joint Federal income tax return for 2000. They reported total income of $36,372, consisting of wages of $7,500, taxable interest income of $12,937, ordinary dividends of $2, taxable pension distribution of $16,288, and a $355 loss from Schedule E, Supplemental Income and Loss.

[*9] Petitioner's Criminal Case

On July 26, 2005, petitioner was indicted by a grand jury in the U.S. District Court for the Middle District of North Carolina (District Court). Petitioner was charged with 12 counts of mail fraud under 18 U.S.C. sec. 1341; 3 counts of wire fraud under 18 U.S.C. sec. 1343; 1 count of financial institution money laundering under 18 U.S.C. sec. 1957; 2 counts of false statements to a bank under 18 U.S.C. sec. 1014; 1 count of theft of healthcare funds under 18 U.S.C. sec. 669; and 3 counts of tax evasion under section 7201. Count 20 of the indictment (for tax evasion under section 7201) states, in pertinent part:

> During the period from on or about January 1, 2000, to on or about November 5, 2001 * * * [petitioner], a resident of Durham, North Carolina * * * did willfully attempt to evade and defeat a large part of the income tax due and owing by him and his spouse to the United States of America for the calendar year 2000 by: 1) concealing and attempting to conceal from all proper officers of the United States of America his true and correct income by depositing funds into and causing funds to be deposited into accounts titled in names other than his own, dispensing funds from and causing funds to be dispensed from accounts titled in names other than his own, receiving payments and causing payments to be issued in names other than his own, and titling assets and causing assets to be titled in names other than his own; and 2) preparing and causing to be prepared, signing and causing to be signed, mailing and causing to be mailed a false and fraudulent joint U.S. Individual Income Tax Return, Form 1040, on behalf of himself and his spouse, which was filed with the Internal Revenue Service * * *

[*10] On February 21, 2006, petitioner entered a voluntary guilty plea in the District Court to 2 counts of mail fraud, 1 count of theft of healthcare funds, and 1 count of tax evasion. On the same date a factual basis was filed in the District Court, which in relevant part states:

> From January 1, 2000, through April 30, 2001, the * * * [petitioner] collected health insurance premiums of approximately $1,400,000, from companies in South Carolina, Florida, and North Carolina and elsewhere, which were diverted and not used to pay claims or insurance for claims[.] From January 1, 2000, through September 30, 2000, no insurance existed[.] From October 1, 2000, through December 31, 2000, a reinsurance/stop loss policy existed but the Fidelity Group, a health care benefit program operated by * * * [petitioner], did not receive or pay the requisite claims to invoke this policy[.] Thus, thousands of health claims went unpaid because the Fidelity Group had insufficient funding and no insurance for the first $125,000 in claims incurred per person. The Fidelity Group operated in interstate commerce because it collected premiums from clients in South Carolina and Florida * * * [. Petitioner] instructed employees to remove the last page of plan description documents containing the words "self-funded" before allowing the plans to be mailed to clients[.] Jim Sikora, in South Carolina, received a plan with the "self-funded" language and was assured by both * * * [petitioner] and * * * [petitioner]'s employee Tim Martin that a "printing mistake" had occured[.]

> During the above time period, * * * [petitioner] utilized the health care premiums for his own personal use[.] For instance, on September 15, 2000, the Sunshine Group wired $150,000 in premiums into * * * [petitioner]'s account in the name of Capital Marketing, Inc[.] A week later, on September 22, 2000, * * * [petitioner] wrote a check on this account for $88,315[.]75 to Cynmar builders to pay for construction of his home in Durham[.] The Sikora Group a [sic] their health premium in late February, 2000,

[*11] but Tim Martin later told him that Fidelity made their last payment to Epoch on February 14, 2000 (actually January 26, 2000)[.] Thus, in late February, Sikora Group remitted a health care premium to * * * [petitioner]'s company, Fidelity, for which his employees received no health care insurance protection[.] Sikora's premium was not returned to him[.]

In March 2001, PMCS, another third party administration hired by * * * [petitioner], returned health claims to * * * [petitioner]/Fidelity Group because they did not receive funding * * * [. Petitioner] instructed employees to refuse to accept shipment of claims and the claims were returned to PMCS[.] Although * * * [petitioner]'s companies collected health insurance premiums from employees, then health insurance claims went unpaid and remain in storage at PMCS today[.]

\* \* \* \* \* \* \*

In the tax year 2000, * * * [petitioner] was a resident of Durham, North Carolina, and filed or caused to be filed a joint U.S. Individual Income Tax Return, Form 1040, on behalf of himself and his spouse, stating that their joint taxable income for the 2000 calendar year was $ 4,833, on which there was due and owing a tax of $ 724[.] In truth and in fact, as * * * [petitioner] then well knew, his income was substantially higher than he reported resulting in a tax due and owing of substantially more than he calculated[.] According to IRS reconstructions of his income and expenditures, * * * [petitioner's] corrected taxable income for 2000 was at least $ 4[,]646,417 on which there was due and owing additional taxes of $ 1,944,392[.]

\* \* \* \* \* \* \*

During calendar year 2000, * * * [petitioner] recognized substantial income and made efforts to conceal his receipt of the same through purchasing property in nominee names. He caused to be constructed a home situated in Orange County, North Carolina, for

**[*12]** his wife and him but had the checks issued to the builder
CynMar for the costs of construction drawn on a Capital Marketing
Inc[.] account. He also issued checks payable for the purchase of
various motorcycles (some of which were put in nominee names) and
had money wired from the Capital Marketing, Inc[.] bank account to
the Bear Stearns investment and brokerage house [for] his personal
investment purposes although the investment accounts were
maintained in the name of a shell entity, Carolina Green, Inc[.] All of
these items constituted income to him as they were for his personal
benefit[.]

Petitioner and his attorney, as well as the Government's attorney, appeared before

the District Court for a change of plea hearing on February 21, 2006, and the

District Court accepted petitioner's guilty plea. During the change of plea hearing

petitioner pleaded guilty to 2 counts of mail fraud, 1 count of theft of healthcare

funds, and 1 count of tax evasion and agreed under oath that the underlying factual

basis was accurate. On June 26, 2006, a judgment in petitioner's criminal case

was entered by the District Court, and he was sentenced to a term of 150 months'

imprisonment.

Notice of Deficiency

Respondent issued to petitioner a notice of deficiency on February 23, 2010,

determining a $1,054,142 deficiency in petitioner's 2000 Federal income tax and a

$790,606.50 fraud penalty under section 6663. On Form 886A, Explanation of

Items, respondent states:

[*13] [Petitioner] * * * submitted false information to insurers and failed to remit the premiums, while providing false proof of insurance certifications to his clients. * * * [Petitioner] also routinely continued to collect premiums from his clients after insurance policies were cancelled by the insurers. Further, in order to divert the funds collected for insurance premiums to his personal use, * * * [petitioner] established financial accounts in the names of nominees, including his wife (* * * [Ms. Piornack]), Capital Marketing, Inc., and Carolina Green, Inc. He used the funds to acquire assets, including an expensive home built in 2000, a "mountain chalet", investments, vehicles and motorcycles, also titled in nominee names in several instances. None of the diverted funds were reported. * * * [Petitioner] pled guilty to Income Tax Evasion under the provisions of Title 26, U.S.C. 7201. Therefore, * * * [petitioner] is collaterally estopped from raising a defense as to the assertion of the section 6663 fraud penalty. * * *

On March 29, 2010, petitioner timely filed a petition disputing respondent's determinations.

Trial was held on June 24, 2015. On September 8, 2015, respondent filed a motion for leave to amend the pleadings to conform to the evidence, which we granted on October 5, 2015. By amended answer on October 5, 2015, respondent asserted an increase in petitioner's tax deficiency of $202,953 and a corresponding increase in the fraud penalty under section 6663 of $152,214.75.

**[*14]** OPINION

1. <u>Unreported Income</u>

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving that the determinations are in error. <u>See</u> Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). For the presumption of correctness to attach with respect to unreported income, the Commissioner's determination must be supported by "some evidentiary foundation linking the taxpayer to the alleged income-producing activity." <u>Blohm v. Commissioner</u>, 994 F.2d 1542, 1548-1549 (11th Cir. 1993) (quoting <u>Weimerskirch v. Commissioner</u>, 596 F.2d 358, 362 (9th Cir. 1979), <u>rev'g</u> 67 T.C. 672 (1977)), <u>aff'g</u> T.C. Memo. 1991-636; <u>see also</u> <u>Williams v. Commissioner</u>, 999 F.2d 760, 763-766 (4th Cir. 1993), <u>aff'g</u> T.C. Memo. 1992-153. Petitioner has not disputed respondent's determination on the grounds that it was incorrect, arbitrary, or did not link him to an income-producing activity, and therefore the burden of proof remains on him to prove by a preponderance of the evidence that respondent's determination is incorrect.[9] <u>See</u> <u>Helvering v. Taylor</u>, 293 U.S. 507, 515 (1935); <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 76-77 (1986).

---

[9]We note that while an evidentiary foundation is required in unreported income cases, the required support is "minimal". <u>Blohm v. Commissioner</u>, 994 F.2d 1542, 1548-1549 (11th Cir. 1993), <u>aff'g</u> T.C. Memo. 1991-636.

**[*15]** In addition, petitioner stipulates receiving some of the income at issue.  In his amended answer respondent asserts that petitioner is liable for an increased deficiency.  As the following discussion demonstrates, the evidence before the Court supports an increased deficiency.  See Rule 142(a)(1).

Section 61(a) defines gross income as "all income from whatever source derived".  This definition is construed broadly and extends to all accessions to wealth over which the taxpayer has complete control.  See Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  As the Supreme Court explained, "[a] gain 'constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it.'" James v. United States, 366 U.S. 213, 219 (1961) (quoting Rutkin v. United States, 343 U.S. 130, 137 (1952)).  A taxpayer has dominion and control when the taxpayer is free to use the funds at will.  Cortes v. Commissioner, T.C. Memo. 2014-181, at *3 (citing Rutkin, 343 U.S. at 137).  The use of funds for personal purposes indicates dominion and control, even if these funds are in an account titled in a name other than the taxpayer's.  See, e.g., Gardner v. Commissioner, T.C. Memo. 2013-67, at *13.

Petitioner reported total income of $36,372 on his joint Federal tax return for 2000, consisting of wages of $7,500, taxable interest of $12,937, ordinary

**[*16]** dividends of $2, taxable pension distribution of $16,288, and a $355 loss from Schedule E. Respondent argues that petitioner failed to report substantial income from his insurance sales and employee leasing business by diverting funds into various bank accounts titled in names other than his own. Respondent further argues that petitioner used diverted funds for the construction of the Owl's Woods residence and to purchase motorcycles and motorcycle accessories. We address each of respondent's contentions separately below.

Interest Income

Respondent determined in the notice of deficiency that petitioner and Ms. Piornack received $76,585 of interest income but reported only $12,937 on their joint 2000 Federal income tax return. Of the $63,648 of alleged unreported interest income (i.e., $76,585 – $12,937), respondent concedes that $22,155.75 is attributable solely to Ms. Piornack. Thus, respondent asserts that petitioner is liable for tax resulting from $41,492.25 of unreported interest income.

Petitioner did not address the issue of interest income at any time during the proceedings before this Court. As such, petitioner is deemed to have conceded this issue pursuant to Rule 34(b)(4). This is further supported by the fact that petitioner stipulates that he received $54,429.25 of interest income in his taxable year 2000, but reported only $12,937. Accordingly, we hold that petitioner

[*17] received $41,492.25 of unreported interest income during his taxable year 2000.

### Owl's Woods Residence

In 2000 petitioner made numerous payments from the Capital Marketing account to Cyn-Mar for the construction of the Owl's Woods residence. Respondent argues that petitioner diverted $1,451,113.35 from his insurance sales and employee leasing business for the construction of the Owl's Woods residence and that this amount is taxable to him for 2000.

Petitioner stipulates that he made payments totaling $1,451,114 to Cyn-Mar for the construction of the Owl's Woods residence and that each check to Cyn-Mar was drawn on the Capital Marketing account and was endorsed by petitioner. The Capital Marketing account listed petitioner's name and the Owl's Woods residence address, and petitioner signed checks on this account.

Furthermore, on February 21, 2006, petitioner pleaded guilty in the District Court to, inter alia, tax evasion for his taxable year 2000. As relevant to the Owl's Woods residence, the factual basis underlying the tax evasion charge states:

> [Petitioner] caused to be constructed a home situated in Orange County, North Carolina, for his wife and him but had the checks issued to the builder CynMar for the costs of construction drawn on a Capital Marketing Inc[.] account. * * * All of these items constituted income to him as they were for his personal benefit.

**[*18]** Petitioner appeared before the District Court on February 21, 2006, and agreed under oath that this factual basis was accurate. Petitioner has not denied the receipt of the moneys used to pay for the construction of the Owl's Woods residence. In his petition, petitioner appears to argue that the moneys used for construction of the Owl's Woods residence were "strictly loans" from "Capital Financial Group, Nations and Integrity Corporation". However, petitioner did not expound upon this contention or present any documentation or other evidence that he received "loans" for the construction of the Owl's Woods residence or that he intended to repay these funds.[10] Moreover, petitioner did not raise at trial any meritorious argument concerning the diverted funds used for the construction of the Owl's Woods residence. Accordingly, we hold that petitioner diverted $1,451,114, which he used to pay Cyn-Mar for the construction of the Owl's Woods residence, and that these funds constituted taxable income.

Commission Payments

The parties stipulate that petitioner issued bills to, and received checks from, Sunshine Co. totaling $128,239.27 for the year in issue. Furthermore, in the petition, petitioner acknowledges that all checks received from Sunshine Co. were

---

[10]Petitioner seemingly acknowledges in his petition that the funds diverted to Cyn-Mar were characterized as "loans" solely to avoid paying tax on the amounts.

[*19] commission payments resulting from the sale of workers' compensation and health insurance and acknowledges that these payments should have been treated as income by his accountant. Accordingly, we hold that the $128,239.27 of commission payments from Sunshine Co. is taxable as income to petitioner for the taxable year 2000.

The parties stipulate that petitioner received and endorsed commission checks from Fidelity Group totaling $276,528.37 and that these checks were deposited into petitioner and Ms. Piornack's personal bank account. In the petition, petitioner appears to argue that the checks from Fidelity Group are actually repayment of moneys he "personally loaned" to Fidelity Group to "pay premiums or claims". Outside of this unsupported contention petitioner did not produce any testimony or other evidence that he lent money to Fidelity Group or that the payments received from Fidelity Group were repayment of loans. Moreover, petitioner offers no explanation why, if the checks are repayment for personal loans, the checks are payable to Capital Marketing and each is classified on its face as a commission payment. Petitioner's contention that the Fidelity Group checks are loan repayments is unpersuasive and inconsistent with the record, and therefore we hold that $276,528.37 of commission payments from Fidelity Group is taxable income that he received in the year 2000.

[*20] <u>Carolina Green</u>

Petitioner authorized wire transfers totaling $1,111,000 from the Capital Marketing account to the Bear Stearns account in 2000. Respondent argues that the distributions from the Capital Marketing account to the Bear Stearns account are taxable to petitioner as income. In his petition, petitioner does not dispute that the amounts transferred to the Bear Stearns account constitute income; however, he appears to argue that the Bear Stearns account had "more than $2,000,000 in losses" which would offset tax owed on this income. Petitioner offered no evidence to substantiate that he incurred losses in the Bear Stearns account or when these purported losses occurred. The parties stipulate that petitioner authorized wire transfers totaling $1,111,000 into his Bear Stearns investment account in the year in issue. Moreover, petitioner appeared before the District Court on February 21, 2006, and agreed that he "had money wired from the Capital Marketing, Inc[.] bank account to the Bear Stearns investment and brokerage house [for] his personal investment purposes although the investment accounts were maintained in the name of a shell entity, Carolina Green, Inc. All of these items constituted income to him as they were for his personal benefit." We hold that the $1,111,000 transferred from the Capital Marketing account to the

[*21] Bear Stearns account is taxable income to petitioner for the taxable year 2000.

Motorcycles, Parts, and Accessories

Respondent argues that funds diverted from the Capital Marketing account for the purchase of motorcycles and motorcycle accessories should be taxable to petitioner as income. In the petition, petitioner alleges that the motorcycles were purchased for employees to drive during warm weather and were not owned by him personally. The parties stipulate that petitioner signed seven checks in 2000-- made payable to either Twin Specialties or Myrtle Beach and/or Rocky Mountain Harley Davidson--totaling $207,936. The Division of Motor Vehicles title history information recognizes Carolina Green as the owner of two 2000 motorcycles and a 2000 private trailer. At trial Ms. Piornack and Alton Brown testified that petitioner owned motorcycles, rode these motorcycles with his friends and business associates, and stored receipts for these motorcycles in the den of his personal residence. Furthermore, petitioner appeared before the District Court on February 21, 2006, and agreed that he had issued checks as payment for the purchase of various motorcycles (some of which were put in nominee names) and that these purchases were income to him because they benefited him personally. Accordingly, we hold that petitioner had taxable income resulting from $207,936

**[*22]** of funds he diverted from the Capital Marketing account to purchase motorcycles and motorcycle-related accessories for the taxable year 2000.

2.  Section 6663 Fraud Penalty

Respondent argues that petitioner's previous conviction for tax evasion under section 7201 collaterally estops him from disputing his liability for the civil fraud penalty under section 6663(a).  Section 6663(a) provides:  "If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud."  The Commissioner bears the burden of proving fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  To satisfy this burden, the Commissioner must establish that:  (1) an underpayment exists, and (2) that the taxpayer intended to evade tax known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. See Sadler v. Commissioner, 113 T.C. 99, 102 (1999); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).  As discussed above, respondent has satisfied his burden of showing that petitioner underpaid his income tax for 2000 and the methods by which petitioner did this, and his own admissions during the prior criminal proceeding are clear and convincing proof of fraud.

**[\*23]** In any event, collateral estoppel precludes relitigation of any issue of fact or law that was actually litigated and necessarily determined by a valid and final judgment. Montana v. United States, 440 U.S. 147, 153 (1979). It is well established that a conviction for tax evasion under section 7201, upon either a guilty plea or a jury verdict, conclusively establishes fraud in a subsequent civil tax fraud proceeding through the doctrine of collateral estoppel. See, e.g., Amos v. Commissioner, 360 F.2d 358 (4th Cir. 1965), aff'g 43 T.C. 50 (1964); DiLeo v. Commissioner, 96 T.C. 858, 885 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992); Marretta v. Commissioner, T.C. Memo. 2004-128, 2004 Tax Ct. Memo LEXIS 130, at \*9, aff'd, 168 F. App'x 528 (3d Cir. 2006). The only practical difference between the elements of criminal tax evasion under section 7201 and civil tax fraud is the "larger quantum of proof required in a criminal evasion case". Moore v. United States, 360 F.2d 353, 355 (4th Cir. 1965).

Petitioner pleaded guilty[11] to tax evasion under section 7201 for 2000, and that judgment has become final. Accordingly, petitioner is precluded from

---

[11]It is immaterial that petitioner's conviction resulted from a guilty plea from the charges brought against him rather than from a trial on the merits after a plea of not guilty. See Gray v. Commissioner, 708 F.2d 243, 246 (6th Cir. 1983) ("A guilty plea is as much a conviction as a conviction following jury trial."), aff'g T.C. Memo. 1981-1. A guilty plea constitutes an admission of all the elements of the criminal charge. McCarthy v. United States, 394 U.S. 459, 466 (1969).

[*24] challenging that he filed a false and fraudulent Federal income tax return with the requisite fraudulent intent. Petitioner is therefore liable for the section 6663 fraud penalty on the amount determined in part 1 of this opinion.

In reaching our decision, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.
