**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FREDRIC A. GARDNER; ELIZABETH A. GARDNER, *Petitioners-Appellants*, | No. 13-72699 |
| | Tax Ct. No. 12016-06 |
| v. | |
| COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellee.* | OPINION |

Appeal from a Decision of the
United States Tax Court

Submitted October 17, 2016[*]
San Francisco, California

Filed January 12, 2017

Before: Michael Daly Hawkins, Consuelo M. Callahan,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Callahan

---

   [*] The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY[**]

### Tax

The panel affirmed the Tax Court's decision denying a petition for redetermination of federal income tax deficiencies that challenged the taxability of alleged maintenance payments received by taxpayers who have taken vows of poverty.

Taxpayers contended that they did not earn taxable income and are exempt from paying taxes because they have taken vows of poverty. They explained that their maintenance is provided by Bethel Aram Ministries (BAM), a church for which taxpayer Elizabeth Gardner is its corporation sole. The panel explained that substantial evidence supports the Tax Court's determinations that the payments taxpayers received were not contributions to BAM but were instead *quid pro quo* payments for taxpayers' services (in setting up corporations sole and LLCs), and that taxpayers retained complete dominion and control over the payments even after they were deposited in BAM's accounts. Accordingly, the payments to taxpayers are taxable and subject to self-employment tax.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Fredric A. Gardner and Elizabeth A. Gardner, Dewey, Arizona, pro se Plaintiffs-Appellants.

Janet A. Bradley and Bridget M. Rowan, Attorneys; Kathryn Keneally, Assistant Attorney General; Tax Division, United States Department of Justice, Washington, D.C.; for Respondent-Appellee.

**OPINION**

CALLAHAN, Circuit Judge:

Elizabeth and Fredric Gardner assert, in a nutshell, that Bethel Aram Ministries (BAM) is a church, that Elizabeth is its corporation sole, and that both Elizabeth and Fredric have taken vows of poverty (with their maintenance provided by BAM). They argue that based on these facts they did not earn taxable income and are exempt from paying taxes.

The Tax Court, however, determined that the payments received by the Gardners were not contributions to BAM and that the Gardners had complete control over BAM's assets. It concluded that because the Gardners "exercised dominion and control over BAM's accounts, all taxable deposits into those accounts are includable in their gross income."

We affirm. The Tax Court's determinations that the payments were *quid pro quo* payments for services and not contributions, and that the Gardners have unfettered control over BAM, are supported by substantial evidence.

# I

Around 1978, the Gardners received degrees in theology from Christ for the Nations Bible College. In 1993, the Gardners formed BAM as "an unincorporated association in Arizona organized to be an 'ecclesiastical church ministry.'" However, they did not file with the IRS a Form 1023, Application for Recognition of Exemption Under Section 501(c)(3). In 1999, the Gardners signed vows of poverty declaring their intent to divest themselves from earnings or wages from BAM and stating that BAM would provide for their needs as pastors of the church ministry. They then transferred all of their assets, including title to their home, to BAM. In 2001, Elizabeth filed articles of incorporation with the State of Nevada, naming her as the corporation sole of BAM.[1] Fredric held himself out as an "Elder, Teacher, Certified Estate & Financial Planner of BAM," and Elizabeth held herself out as a "Prophetess, Teacher, Pastor and Certified Paralegal" of BAM. Together they have unfettered control over BAM's operations and finances.

From 2002 until August 2004, BAM did not have any congregation. Rather, the Gardners traveled across the country offering their services in setting up corporations sole and limited liability companies (LLCs). Their promotional literature claimed the benefits of a corporation sole included:

---

[1] The IRS's tax guide for Churches and Religious Organizations notes that "religious organizations may be legally organized in a variety of ways under state law, such as unincorporated associations, non-profit corporations, corporations sole, and charitable trusts." The IRS has defined a "corporation sole" as "a corporate form authorized under certain state laws to enable *bona fide* religious leaders to hold property and conduct business for the benefit of the religious entity.'" Rev. Ru. 2004-27, 2004-1 C.B. 625, 626, 2004 WL 389673, at *1.

(1) the government was not able to interfere in any way; (2) all church workers would be classified as ministers of the gospel and not as employees; (3) there were no filing requirements of any kind; and (4) there were no withholding or self-employment taxes or income tax. The Gardners advised that if a corporation sole received an inquiry from the Internal Revenue Service (IRS), it should notify the IRS that it was a corporation sole and provide no other information.

The Gardners had a "donation" sheet setting forth the costs of their services. It instructed customers to "please make separate checks out" according to the following schedule: "(1) for a corporate sole, BAM for $1,200, Carol Spackman[2] for $80, and the State of Nevada for $85; [and] (2) for an LLC, BAM for $700, Ms. Spackman for $80, and the State of Nevada for $235." The record indicates that the Gardners established over 300 corporations sole and approximately 18 LLCs for others.[3]

The Gardners failed to file tax returns for the years 2002 through 2004, and refused to provide the IRS with BAM's

---

[2] Ms. Spackman served as the registered agent in Nevada for most of the corporations sole the Gardners established.

[3] In March 2008, the U.S. District Court for the District of Arizona enjoined the Gardners from "[o]rganizing, promoting, marketing, or selling corporations sole or any tax shelter, plan or arrangement, that advises, assists, or encourages taxpayers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities." *United States v. Gardner*, No. CV-05-3073-PCT-EHC, 2008 WL 906696, at *6 (D. Ariz. Mar. 21, 2008). The district court found that the Gardners had participated in an abusive tax shelter program promising unwarranted tax benefits from corporations sole. *Id*. at *5. The injunction was affirmed on appeal. *United States v. Gardner*, 457 F. App'x 611, 612 (9th Cir. 2011).

books and records.  The IRS obtained bank records from
BAM's Wells Fargo accounts through a third-party summons
and undertook a bank deposit analysis.  The IRS "determined
that petitioners had gross bank deposits of $101,722,
$219,481, and $281,232 and net taxable deposits of $100,070,
$217,973 and $235,679 for 2002, 2003, and 2004,
respectively."  The IRS issued notices of deficiency and the
Gardners petitioned the Tax Court for review.

## II

The Tax Court noted that generally the Commissioner's
determination of a taxpayer's liability is presumed correct,
and the taxpayer bears the burden of proving that the
determination is improper. *Gardner v. Comm'r*, 105 T.C.M.
(CCH) 1433, at *3 (2013) (citing *Welch v. Helvering*,
290 U.S. 111, 115 (1933)). The Tax Court recognized that in
the Ninth Circuit for the presumption of correctness to attach
in a case involving unreported income, the IRS must "first
establish an evidentiary foundation linking the taxpayer to the
alleged income-producing activity." *Id*. (citing *Weimerskirch
v. Comm'r*, 596 F.2d 358, 361–62 (9th Cir. 1979)).  The Tax
Court reasonably determined that the IRS had linked the
Gardners to the payments and that therefore the Gardners
bore the burden of proving the deficiencies arbitrary or
erroneous.  The Tax Court also determined that the bank
deposit method of reconstructing income was properly used
in this instance. *Id*. at *4; *see Clayton v. Comm'r*, 102 T.C.
632, 645 (1994) (holding that the "use of the bank deposit
method for computing unreported income has long been

sanctioned by the courts" (citing *DiLeo v. Comm'r*, 96 T.C. 858, 867 (1991), *aff'd* 959 F.2d 16 (2d Cir. 1992))).[4]

The Tax Court determined that the payments the Gardners deposited into BAM's bank accounts constituted taxable income to the Gardners. Citing *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955), the Tax Court noted that the definition of gross income "is construed broadly and extends to all accessions of wealth, clearly realized, over which the taxpayer has complete control." *Gardner*, 105 T.C.M. (CCH) 1433 at *5. It further held that when the IRS reconstructs income using the bank deposit method, it may include gross income deposited into all accounts over which the taxpayer has dominion and control, even "where a taxpayer has dominion and control over an account titled in the name of a church or other religious organization." *Id*.; *see Woods v. Comm'r*, 58 T.C.M. (CCH) 673 (1989), *aff'd*, 929 F.2d 702 (6th Cir. 1991).

Relying on its decision in a strikingly similar case, *Gunkle v. Commissioner*, 104 T.C.M. (CCH) 527 (2012), *aff'd*, 753 F.3d 502 (5th Cir. 2014), the Tax Court rejected the Gardners' arguments that their deposits were gifts or donations to a legitimate church, that they had taken vows of poverty, and that they acted as agents of BAM. The Gunkles, with the Gardners' assistance, had established their religious organization as a corporation sole. The Gunkles then signed vows of poverty stating that their church would provide for their support. The Gunkles used funds in the pastoral account to pay living and personal expenses, but did not report deposits into the account as income. The Tax Court rejected

---

**[4]** On appeal, the Gardners do not challenge the use of the bank deposit method.

the Gunkles' arguments that the deposits were nontaxable gifts and that their vows of poverty insulated them from taxation on the compensation they received for their services to their church. In rejecting the Gardners' similar clams, the Tax Court cited its holding in *Gunkle* that "[p]ayments or benefits received in exchange for services rendered by individuals and not on behalf of a separate and distinct principal are taxable to the individuals." *Gardner*, 105 T.C.M. (CCH) 1433 at *6.

The Tax Court found that the deposits into BAM's bank accounts "were compensation to petitioners for the services they performed in setting up corporations sole, LLCs, and trusts," and "were not gifts or donations [but] represented a *quid pro quo* exchange; *i.e.*, the payors were receiving petitioners' services in consideration for their payments." *Id*.

The Tax Court next rejected the Gardners' arguments concerning their vows of poverty and that they were acting as agents of BAM. It noted that the Gardners did not have any personal bank accounts, used BAM's accounts as their own and for their own benefit, deposited the payments they received from setting up corporations sole and LLCs into BAM's accounts, withdrew funds from BAM's accounts to pay their personal expenses, and exercised complete dominion and control over BAM's accounts. The Tax Court noted that there was "no evidence that petitioners were accountable to anyone for the funds in BAM's accounts." *Id*. Accordingly, the Tax Court concluded that the deposits into the BAM accounts were includable in the Gardners' gross income.

In addition, the Tax Court held that the Gardners' self-employment income was subject to self-employment tax. It

rejected the Gardners' claim that they were exempt from self-employment tax because they are ordained ministers. *Id*. at *7–8. The Tax Court determined that the Gardners failed to present "any credible evidence that they had submitted a Form 4361, Application for Exemption From Self-Employment Tax for Use by Ministers, Members of Religious Orders and Christian Science Practitioners, for the years in issue that was approved by the IRS." *Id*. at 8. The Tax Court concluded that the Gardners had "failed to prove they were exempt from self-employment tax during the years in issue." *Id*.[5]

## III

We review decisions of the Tax Court on the same basis as decisions in civil bench trials in district court, and accordingly, we review conclusions of law de novo and questions of fact for clear error. *Johanson v. Comm'r*, 541 F.3d 973, 976 (9th Cir. 2008); *Millenbach v. Comm'r*, 318 F.3d 924, 930 (9th Cir. 2003).

### A. The payments were not contributions.

In *Hernandez v. Commissioner*, 490 U.S. 680 (1989), the Supreme Court established a *quid pro quo* test for determining whether a payment was a contribution. *Id*. at 690–91 (noting that the *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration). The Court held that payments to the Church of Scientology for "auditing" or pastoral counseling were not contributions as "these payments were part of a

---

[5] The remainder of the Tax Court's opinion addresses issues not germane to this appeal.

quintessential *quid pro quo* exchange: in return for their money, petitioners received an identifiable benefit, namely auditing and training sessions." *Id*. at 691.

Similarly, the Gardners, in exchange for money, provided "identifiable benefits,"—the creation of corporations sole and LLCs. In addition, as in *Hernandez*, here the Gardners had a schedule of set amounts payable for the benefits they offered. 490 U.S. at 685. That the payments were referred to as suggested donations is not dispositive; it is the *quid pro quo* nature of the exchange that controls. *Id*. at 690–91.[6]

The Gardners' First Amendment argument is similarly foreclosed by *Hernandez*, which rejected the Church of Scientology's argument that declining to treat the payments as contributions violated the Establishment Clause. Applying the test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Court found that the statute: (1) made no explicit or deliberate distinction between different religious organizations, but applied to all religious entities; (2) neither advanced nor inhibited religion; and (3) threatened no entanglement between church and state. *Hernandez*, 490 U.S. at 695–96. The Court further noted that even if it were necessary "to ascertain what portion of a payment was a purchase and what portion was a contribution," this would "not ineluctably create entanglement problems." *Id*. at 697. Applying the *Lemon* test to the Gardners' case produces the same

---

[6] The Gardners' argument that witnesses testified that they intended the payments to be contributions is not persuasive. Although the witnesses indicated that they referred to the payments as contributions, none denied that the payments were made in return for the Gardners' assistance in forming corporations sole. In other words, none denied the *quid pro quo* nature of the transactions.

conclusion. Treating the Gardners' recompense for setting up corporations sole and LLCs as taxable income does not distinguish between religious organizations, neither advances nor inhibits religion, and threatens no entanglement.

We conclude that the Tax Court properly applied *Hernandez* in holding that the payments to the Gardners for creating corporations sole and LLCs were not donations to BAM.

### B. The Gardners had complete control over the payments to BAM.

The Tax Court's determination that the Gardners had complete control over the payments to BAM is a factual issue reviewed for clear error. *See Nunley v. Comm'r*, 758 F.2d 372, 373 (9th Cir. 1985). There is substantial evidence that the Gardners had complete dominion and control over the payments deposited in BAM's accounts and that they used those funds to cover their personal expenses, including a veterinarian bill. Indeed, the Gardners do not really deny that they exercised complete control over BAM and its accounts.

Rather than directly challenge the Tax Court's factual findings, the Gardners argue that the IRS and the Tax Court should have respected BAM's separate identity. This seems a little like arguing that Clark Kent is not Superman. Certainly Superman displays abilities that Clark Kent denies having, but they are one and the same. Similarly, here, there is no practical distinction between the Gardners and BAM.

The Gardners' assertion that their creation of a religious organization over which they have complete control insulates them from taxes is contrary to longstanding Supreme Court

precedent. As early as 1930, the Supreme Court in *Corliss v. Bowers*, 281 U.S. 376, 378 (1930), held that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." The Court concluded that "[t]he income that is subject to a man's unfettered command and that he is free to enjoy at his own opinion may be taxed to him as his income, whether he sees fit to enjoy it or not." *Id*. Over forty years later in *United States v. Basye*, 410 U.S. 441, 449–50 (1973), the Supreme Court reaffirmed that the principle "that he who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle, has been repeatedly invoked by this Court and stands today as a cornerstone of our graduated income tax system."[7]

Here, the Gardners' vows of poverty attempt to disguise their enjoyment of their personal income. Pursuant to *Corliss* and *Basye*, as long as the Gardners have complete control over the funds, it makes no practical difference whether the funds are titled in their names or in BAM's.

Our approach is in accord with the Fifth Circuit's opinion in *Gunkle*, which framed the nub of the controversy as follows:

---

[7] We and our sister circuits have reiterated this position. *See George v. Comm'r*, 837 F.3d 79, 85 (1st Cir. 2016); *C.M. Thibodaux Co., Ltd. v. United States*, 915 F.2d 992, 994 (5th Cir. 1990); *United States v. Tranakos*, 911 F.2d 1422, 1431 (10th Cir. 1990); *United States v. Krall*, 835 F.2d 711, 714 (8th Cir. 1987); *United States v. Russell*, 804 F.2d 571, 574 (9th Cir. 1986); *Fogarty v. United States*, 780 F.2d 1005, 1008 (Fed. Cir. 1986); *O'Donnell v. Comm'r*, 726 F.2d 679, 681 (11th Cir. 1984); *Armantrout v. Comm'r*, 570 F.2d 210, 212 (7th Cir. 1978).

> Income received by the agent of a principal is deemed to be the income of the principal and not the income of the agent. It follows that income received by a member of a religious order as the agent of the order, promptly delivered to the order based on the agent's vow of poverty, is deemed to be the income of the order and not of the agent. Conversely, however, a member of a religious order who earns or receives income therefrom in his individual capacity cannot avoid taxation on that income merely by taking a vow of poverty and assigning the income to that religious order or institution. The same rule applies to entities organized as corporation soles. [A]n individual has received income when he gains complete dominion and control over money or other property, thereby realizing an economic benefit.

753 F.3d at 507–08 (footnotes omitted). The Fifth Circuit did not expressly address the problem it identified: How does a court determine whether income is received by a member of a religious order *as the agent of the order*, or whether the member of a religious order *earns or receives income therefrom in his individual capacity*? However, it determined that the Gunkles had unrestricted dominion and control over their pastoral accounts and that their compensation was taxable. *Id.* at 508. Thus, the Fifth Circuit implicitly recognized that there was no real distinction between the Gunkles and their wholly-controlled religious entity. Clark Kent is not distinguishable from Superman.

This was also the holding of the Tax Court in *Gunkle*, which underlies the Tax Court decision in the Gardners' case, and which we now endorse. In *Gunkle*, the Tax Court explained that payments in exchange for services "rendered by individuals and *not on behalf of a separate and distinct principal* are taxable to the individuals." *Gunkle*, 104 T.C.M. (CCH) 527 at * 3 (emphasis added). Thus, consistent with the Supreme Court's admonition in *Corliss*, 281 U.S. at 378, that taxation is concerned with the "actual command over the property taxed," the Tax Court—having determined that the Gardners retained dominion over the funds—properly concluded that they had received the payments in their individual capacities, and not as agents of BAM.

The exercise of complete dominion and control over the funds at issue was also dispositive in *Woods v. Commissioner*, 58 T.C.M. (CCH) 673 (1980). There, the Tax Court explained that it was "not necessary to disregard the separate existence of the church or to challenge the tax status of the church as an entity in order to sustain respondent's determinations in this case" because however the petitioners obtained the funds "petitioners exercised complete dominion and control over deposits into the various bank accounts." *Id*. In *Woods*, as with the Gardners and the Gunkles, the taxpayers' complete control over their "churches" supports the determination that the taxpayers' receipts constituted taxable income for the taxpayers despite the assignment of those receipts to their churches.

The Gardners attempt to distinguish *Gunkle* on the ground that the Gunkles deposited Social Security payments and retirement pay, which were not earned as part of their ministry, into their corporation sole's accounts. In contrast, the Gardners suggest that creating corporations sole is

consistent with their church's mission.  But the rulings by the Fifth Circuit and the Tax Court, and our holding in this case, focus not on what the taxpayer did to obtain a payment, but on which party exercised dominion and control over the funds.  As long as the individual taxpayer (the purported agent) remains, as a practical matter, in complete control over the income after it is transferred to the church (the purported principle) it is income to the individual.**[8]**

The Tax Court's ruling that the payments are taxable is affirmed on the grounds that the Gardners, the purported agents of BAM, earned the payments as individuals and retained complete control over the payments even after their transfer to BAM, the purported principal.

## IV

Finally, the Gardners argue that they are exempt from paying income taxes pursuant to 26 U.S.C. § 1402.  They note that 26 C.F.R. § 1.1402(e)–2A(a)(1) states, in relevant part:

> Subject to the limitations set forth in subparagraphs (2) and (3) of this paragraph, any individual who is . . . a duly ordained,

---

**[8]** Of course, certain payments, although income, may not be taxable. For example, if an individual's compensation for an injury is not considered taxable income, it would not become taxable just because the individual assigned it to his church.  Also, if Elizabeth Gardner sells copies of her book at cost, so that there is no net profit, she would have gross income, but this might not be taxable income.  On the other hand, any profit from the sale of the books likely would be taxable income regardless of whether the books were purportedly sold by Elizabeth or BAM as long as Elizabeth continued to exercise complete dominion and control over the funds.

> commissioned, or licensed minister of a
> church or a member of a religious order (other
> than a member of a religious order who has
> taken a vow of poverty as a member of such
> order) . . . may request an exemption from the
> tax on self-employment income (see section
> 1401 and § 1.1401-1) with respect to services
> performed by him in his capacity as a minister
> or member . . . as the case may be.

The Gardners contend that this regulation exempts
them—as members of a religious order who have taken vows
of poverty—from having to request an exemption from tax on
self-employment income by filing a Form 4361, Application
for Exemption From Self-Employment Tax for Use by
Ministers, Members of Religious Orders and Christian
Science Practitioners.

Even assuming, however, that the Gardners reasonably
determined that they were not required to file a Form 4361,
it does not follow that they are exempt from self-employment
tax.  The exemption from self-employment tax is only
applicable to "services performed by [one] in his capacity as
a minister or member." 26 C.F.R. § 1.1402(e)-2A(a)(1); *see
Wingo v. Comm'r*, 89 T.C. 922, 929 (1987).  Because the Tax
Court reasonably concluded that the Gardners received
payment in exchange for their work in setting up corporations
sole and LLCs, and not in the exercise of a ministry, this
exception does not apply.[9]  Accordingly, they have not shown

---

[9] The Gardners do not actually claim that setting up corporations sole
is part of their ministry.  Indeed, creating corporations sole does not
appear to have any relationship to BAM's mission.  Its mission statement
reads:

that they qualify for exemption from self-employment tax under 26 U.S.C. § 1402.

## V

Elizabeth and Fredric Gardner were free to create BAM, a corporation sole, but this did not exempt their personal income from taxation. The payments they received were *quid pro quo* payments for their services in setting up corporations sole and LLCs; they were not contributions to BAM. Moreover, the Gardners retained complete dominion and control over BAM and its accounts. Because the payments were made in exchange for the Gardners' services, and the Gardners retained complete dominion and control over the payments even after they were deposited into BAM's accounts, the Tax Court properly concluded that the payments received by the Gardners are taxable and that they are subject to self-employment tax. The Tax Court's decision is **AFFIRMED**.

---

The mission of Bethel Aram Ministries an ecclesiastical church is to manifest Yahshua/Jesus' glory throughout the earth; to do the work of the ministry through religious, charitable, educational and/or humanitarian purposes for the perfecting of the saints; provide scriptural education materials, establish congregations, practice, teach, preach the Good News of Messiah in order to bring people to a personal relationship with Yahshua/Jesus the Messiah to obey the Commandments of the Sovereign Holy Nation of the Most High and the Good News of the Saviour in congregations through affiliated fellowships of Saints of Yahshua/Jesus, the Messiah and King of His Sovereign Kingdom.