# United States Tax Court

T.C. Memo. 2024-88

MARK FEATHERS AND NATALIE E. FEATHERS,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 9371-14.                    Filed September 23, 2024.

_____

Mark Feathers and Natalie E. Feathers, pro sese.

*Michael Skeen* and *Lesley A. Hale*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, *Judge*: Mark and Natalie Feathers were the majority shareholders of Small Business Capital Corp. (SBCC). SBCC managed two LLCs, both of which sent substantial sums of money to SBCC in 2009 and 2010. SBCC itself sent substantial sums of money to Mark Feathers. SBCC did not include all the money from the LLCs in its gross receipts. The Featherses did not include all the money from SBCC in their gross income.

The Featherses claim that the sums sent from the LLCs to SBCC were merely loans, and that the sums sent from SBCC to Mr. Feathers were for consulting. The Commissioner says that the Featherses have no good reason to exclude any part of this cash flow from their taxable income.

[*2]                    FINDINGS OF FACT

I.      *The Featherses' Origins*

Mark Feathers was raised up and down the east coast but claims Pennsylvania as his home state. He earned a bachelor's degree in finance from Penn State. After he graduated in 1987, he joined the Navy, served two years, and landed on the west coast. After coming ashore he earned an MBA from Golden Gate University. He then began work at the Small Business Administration's (SBA) regional and district offices in San Francisco.

Mr. Feathers's career in public service was short lived. In 1994, he moved to a community bank to work as a senior underwriter. He spent the next several years seeking more opportunity and higher pay at a succession of community and national banks including Wells Fargo and Citibank. At each stop he focused on the development and marketing of SBA-related services.

After years of working for others in both the private and public sectors, Mr. Feathers opened his own business in 2004. He first named it 504 1st Mortgage Lending Corp., but by 2006 he had renamed it SBCC. The name sounds generic, and the record became more confusing because Mr. Feathers had SBCC do business under the name SB Capital, LLC (SB Capital), and then in 2009 began a sole proprietorship under the name Small Business Capital. During the years at issue— 2009 and 2010—Mr. Feathers held around 80% of SBCC's stock. He was also a director, the chief executive officer, and the designated broker of record for the company.

SBCC was in the business of real-estate mortgage brokering, but was not itself a direct lender. The company profited by setting up investment funds and creating loan portfolios for them. It also profited by charging those funds organizational and management fees. We focus in this case on two funds that Mr. Feathers created for SBCC to manage—Investors Prime Fund, LLC and SBC Portfolio Fund, LLC.

The brokering and investment-fund businesses went well at first. SBCC looked like a success, and Mr. Feathers's wife Natalie left her position as senior vice president for a community bank to join him at SBCC.

**[*3]** II.  *Relationship Between the Featherses and the Entities*

Because this case hinges on the characterization of money transferred between the Featherses and SBCC, as well as between SBCC and the Funds, we begin with an explanation of the structure of SBCC and the Funds and then a description of their relationship.

A.  *Structure of SBCC and the Funds*

SBCC was incorporated in California and was at first taxed as a C corporation.[1] SBCC later elected to be treated as an S corporation on its return and maintained that status through the tax years at issue.[2] Electing to be treated as an S corporation meant that SBCC was subject to the laws of subchapter S of the Code.  S corporations generally don't pay federal income tax.  They function instead like partnerships— passthrough entities that route income and deductions to their owners. *See Gitlitz v. Commissioner*, 531 U.S. 206, 209 (2001).  A shareholder of an S corporation is required to report his share of the corporation's income and deductions on his individual return.  *Hill v. Commissioner*, 100 T.C.M. (CCH) 513, 515 (2010).  Since Mr. Feathers was a shareholder of SBCC, he had such an obligation.

Both of the Funds were also passthrough entities.  They were set up as California LLCs: Investors Prime in 2005 and SBC Portfolio in 2007.  Mr. Feathers did not have a direct membership interest in the Funds, but SBCC was both the Funds' sole manager and the issuer of their membership interests.

---

[1] A "C corporation" is a corporation that is taxed under subchapter C of chapter 1 of the Internal Revenue Code (Code), §§ 301–385.  (Unless otherwise indicated, statutory references are to the Code, Title 26 U.S.C., in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.)

[2] A corporation which would otherwise be treated as a C corporation can elect to be treated as an S corporation on its return if it is a "small business corporation." § 1362(a).  The Code defines a "small business corporation" as a domestic corporation that does not (1) have more than 100 shareholders, (2) have as a shareholder certain entities which are not defined as individuals, (3) have a nonresident alien as a shareholder, or (4) have more than one class of stock. § 1361(b)(1).  An election to be an S corporation stays in effect until it is terminated.  § 1362(c).

**[\*4]** B.     *Relationship of SBCC and the Funds*

1.     *Management Responsibilities*

SBCC's role as manager put it in charge of issuing and overseeing the loans made through the Funds.  This is a regulated industry, and SBCC used its California finance lender license from the California Department of Corporations, as well as the California real-estate broker's license that Mr. Feathers held and could use on SBCC's behalf.

The Funds had to disclose what they would pay SBCC.  In Investors Prime's offering circular, and SBC Portfolio's private-placement memorandum, the Funds disclosed that each would pay SBCC both management fees and origination fees if and when SBCC found loan opportunities that the Funds would be interested in.  These loans would be secured by first and second deeds of trust, which were themselves secured by both commercial, and income-producing residential, real estate.  Following the old real-estate maxim that "a fast nickel is worth more than a slow dime" the Funds aimed to make loans with only a one or two-year maturity.  Mr. Feathers's hope was that quicker, smaller profits would offset SBCC's and the Funds' startup costs.

These management and origination fees were SBCC's upside if the Funds' lending proved profitable.  SBCC, however, did have protection on the downside because both Funds agreed to reimburse SBCC for any expenses it incurred in managing them.[3]

2.     *Issuing Membership Interests*

In addition to being sole manager of the Funds, SBCC was also in charge of issuing membership interests in the Funds to investors.  This meant that it had to abide by section 5 of the Securities Act of 1933, 15 U.S.C. § 77(e), which forbids the sale or offering of unregistered securities in interstate commerce.  *See W. Fed. Corp. v. Erickson*, 739 F.2d 1439, 1442 (9th Cir. 1984).  SBCC did not register the Funds, but

---

[3] Both Funds' operating agreements stated:

The Manager shall be reimbursed by the Company for all organizational syndication and operating expenses incurred on behalf of the Company, including without limitation, out of pocket general and administrative expenses of the Company, accounting and audit fees, legal fees and expenses, postage, and preparation of reports to Members.

**[\*5]** instead invoked two exceptions to the usual registration requirement.

Investors Prime relied on section 202(c) of the Securities Exchange Act of 1934, ch. 404, 48 Stat. 881, 906 (codified as amended at 15 U.S.C. § 77c(a)(11)), and Securities & Exchange Commission (SEC) Rule 147, 17 C.F.R. § 230.147 (2024). These exceptions allow the issuance of unregistered securities as long as both offerors and purchasers reside in the same state. Since SBCC and Investors Prime were both California entities, this meant that it could sell interests only to California residents.

SBC Portfolio relied on section 4(2) of the Securities Act of 1933, ch. 38, 48 Stat. at 77 (codified as amended at 15 U.S.C. § 77d(a)(2)), and SEC Regulation D, 17 C.F.R. § 230.506 (2024). This exemption allows for the sale of unregistered securities in a nonpublic offering.[4]

III.  *SBLC Lending License*

In 2009, SBCC began working with the SBA to obtain a Small Business Lending Company (SBLC) license.[5] This license allows lenders to make "7(a) loans" with federal guaranties.[6] The federal guaranty reduces the level of risk for a lender as well as the cost of the loan to a borrower.[7] *See 7(a) Loan Program*, U.S. Small Bus. Admin.,

---

[4] The Ninth Circuit has a four-factor test to determine if an offering falls within this exemption: "(1) the number of offerees, (2) the sophistication of the offerees, (3) the size and the manner of the offering, and (4) the relationship of the offerees to the issuer." *W. Fed.*, 739 F.2d at 1442 (citation omitted). SBC Portfolio's eligibility for this exemption is not an issue in this case, so we won't trudge through the factors.

[5] An SBLC "is a non-depository lending institution that is SBA-licensed and is authorized by SBA to make loans pursuant to section 7(a) of the Small Business Act and loans to intermediaries in SBA's Microloan program." 13 C.F.R. § 120.10 (2024).

[6] A 7(a) loan is available to a small business when real estate is part of a business purchase when a small business needs short or long-term working capital, to refinance current business debt, to purchase and install machinery and equipment, or to purchase furniture, fixtures, or supplies. *See 7(a) Loans*, U.S. Small Bus. Admin., https://www.sba.gov/funding-programs/loans/7a-loans#id-what-is-aa-loan (last visited Sept. 17, 2024).

[7] Mr. Feathers testified that the SBA also licensed the Funds to make loans under the SBA's 504 loan program. A 504 loan, like a 7(a) loan, is backed by the federal government. 504 loans are long-term, fixed-rate financing to small businesses to promote business growth and job creation. *See 504 Loans*, U.S. Small Bus. Admin., https://www.sba.gov/funding-programs/loans/504-loans (last visited Sept. 17, 2024). These loans can be made by certified development companies that are authorized by

[*6] https://www.sba.gov/partners/lenders/7a-loan-program (last visited Sept. 17, 2024). The active secondary market for loans backed by the SBA gives an SBLC opportunities to sell the guarantied portion of the loans on the secondary market. *Id.* Doing so allows a lender to increase its liquidity, and issue more loans more quickly. *Id.*

Obtaining one of these licenses is no small undertaking. In the 1980s the SBA imposed a moratorium on granting new SBLC licenses after it had issued only 14—and there were no new ones through 2010. *See* Press Release No. 23-35, Small Bus. Admin., U.S. Small Business Administration Now Accepting Applications for Small Business Lending Company License (June 1, 2023), https://www.sba.gov/article/2023/06/01/us-small-business-administration-now-accepting-applications-small-business-lending-company-license. It does not require much study of economics to predict what happens when the government creates a shortage of a valuable asset: The creation of a small market in SBLC licenses from companies that already had one. And this was no free market—though companies were allowed to negotiate the terms of the exchange, the SBA reserved to itself the right to reject any transfer. Small Business Lending Company Application Process, 88 Fed. Reg. 32,623 (May 22, 2023).

The consequence of this government-sponsored shortage was exactly what one would expect: Even when Mr. Feathers found a license for sale, it came with an upfront cost of $750,000—though Mr. Feathers was unclear on whether this was just the cost of the license itself or included the cost of trips to D.C. to win SBA approval. Mr. Feathers did not have SBCC pay these costs itself. Investors Prime paid the $750,000 it needed to buy the license in addition to the incidental costs incurred in its pursuit. It finally got the license in April 2010 and transferred it to a wholly owned subsidiary named SB Capital.

In addition to the many hats that he wore at SBCC, Mr. Feathers testified that he also consulted for the company in his personal capacity through a sole proprietorship that he owned. SBCC's ledgers do show that SBCC paid $171,000 to Mr. Feathers in 2009 and $165,000 in 2010. There was no written consulting agreement between SBCC and Mr. Feathers, but there were many written notations on the checks or in the

---

the SBA. *See* 13 C.F.R. § 120.10. In his testimony, Mr. Feathers did not state when SBCC obtained authorization or whether part of the license he sought included obtaining authorization as a certified development company. He only mentions obtaining a license. Because of this, we will focus on the expenses and challenges of becoming a 7(a) lender.

[*7] descriptions on the wire transfers, which for the most part state "consulting" or "consulting fee" or something similar.

IV.  *The "Loan"*

The time and effort SBCC devoted to obtaining the license reduced the time it spent on finding good lending opportunities for the Funds themselves.  And Investors Prime was out even more than $750,000[8] because Mr. Feathers directed more and more money to flow from the Funds to SBCC.  This put the Funds, and particularly Investors Prime, into a bit of a hole.  Mr. Feathers proposed filling the hole by restructuring SBCC's relationship with them.  He aimed to accomplish this by characterizing the transfers as "loans" from the Funds to SBCC.

Mr. Feathers reasoned that relabeling the money that had been transferred from the Funds to SBCC as a loan and not a reimbursable expense would signal to potential investors that SBCC would ultimately be sending money to the Funds instead of the reverse.  Mr. Feathers liked this idea so much that he moved an additional $1,850,000 from Investors Prime to SBCC in December 2010—he said to pay for future expenses that SBCC might incur.  These loans—if that's what they were—were at first accounted for only in Mr. Feathers's head.  But then in 2011 he had the Funds issue notes to SBCC to create a paper record.

But there was a problem.  The Investors Prime offering circular and the SBC Portfolio's private-placement memorandum both prohibited the Funds from lending to SBCC.[9]

---

[8] The record is ambiguous as to whether SBC Portfolio was also responsible for costs associated with obtaining the SBLC license.  As we mentioned *supra* note 7, Mr. Feathers testified that both the 504 and 7(a) loans authorized by the license were supplied by the Funds.  It is possible that the time Mr. Feathers spent obtaining the license he also spent obtaining authorization for the 504 loans for which SBC Portfolio would benefit, but we have no evidence of this.

[9] The Featherses dispute the fact that these loans were ever prohibited even though both SBC Portfolio's private placement memorandum and Investors Prime's offering circular had a provision that stated:  "No loans will be made by the Fund to the Manager or to any of its affiliates, except for any financing extended as part of a sale of real estate owned or loans purchased as a result of foreclosure."

The Featherses claim that this language referred to mortgage loans since it fell within that section of the agreement.  The audited financial statements for both companies, however, state that the notes that SBCC received from both Investors Prime and SBC Portfolio were prohibited by their operating agreements and that changes to allow for them were not executed for at least one of each of the companies' loans until after the notes had been executed.

[*8]   Mr. Feathers recognized the problem and amended both Funds' operating agreements to permit them to lend money to SBCC.  Investors Prime was able to make the amendment before the execution of the notes, but SBC Portfolio was not.[10]

V.    *Tax Reporting*

A.    *SBCC*

On its 2009 and 2010 returns, SBCC did not report as gross receipts all the money that it received from the Funds.  It did report some:

| Year | Gross Receipts or Sales | Losses |
|------|------|------|
| 2009 | $858,839 | $470,711 |
| 2010 | 366,452 | 1,509,924 |

B.    *The Featherses*

Remember, however, that this is a case about the Featherses' income, not that of SBCC or the Funds.[11]  The Featherses jointly filed their 2009 tax return in March 2011, and their 2010 tax return in May 2013.  They reported the following gross receipts or sales and passthrough income:

| Year | Gross Receipts or Sales | Passthrough Income |
|------|------|------|
| 2009 | — | −$366,445 |
| 2010 | $63,000 | — |

C.    *Investigation and Audits*

Money investors send to regulated funds that then send the money on to their manager which sends it on to the manager's individual

---

[10] Mr. Feathers's amendment to Investors Prime's operating agreement allowed the conversion of current and future organizational expenses up to 1% of the maximum fund capitalization into a receivable from the fund manager.  This was ultimately approved by shareholders and the California Corporations Commission in November 2010.  We could find no equivalent language in SBC Portfolio's operating agreement before an amendment that became effective as of January 25, 2011.

[11] The record can be a bit confusing. In his brief the Commissioner repeatedly conflates the Featherses and SBCC, referring to SBCC as "petitioner".  We stress that this case is about the Featherses; SBCC is a passthrough corporation, but is itself a separate entity.

[*9] owners is usually tracked more carefully, and such cash flows are usually accompanied by a raft of documentation to make it all legal. By not doing so with the cash that went from the investors to the Funds to SBCC and then to himself, Mr. Feathers caught the attention of the SEC. In June 2012, the SEC persuaded a district judge to place SBCC and the Funds into receivership. And then, in 2014, Mr. Feathers was indicted for both securities fraud and mail fraud. The indictment alleged that he had fraudulently represented that the Funds earned returns of at least 7.5% from their mortgage-loan portfolios, when those payouts were partially funded with money from new investors.

The indictment also alleged that Mr. Feathers had fraudulently represented that the Funds could not lend money to SBCC by putting that text into the Funds' operating agreements while in fact taking money from the Funds to send to SBCC. It also charged Mr. Feathers with breach of fiduciary duty for not disclosing that he was using the Funds' money to pay for the operating expenses of SBCC and other companies.

If that were not enough, the government also alleged that in a newsletter sent to the Funds, Mr. Feathers and SBCC "regularly made statements reassuring investors that the funds were making loans secured by first and second deeds of trust and that all loans were performing" when in actuality, the "loans" to SBCC were unsecured and not producing any interest income at all.

To sum it up, Mr. Feathers—in cahoots with SBCC—allegedly

> held unsecured loans in excess of $5.5 million owed to the Funds, handmade 'Ponzi' payments intended to lull investors into a false sense of security by creating the appearance that the Funds were engaging in successful debt financing agreements and otherwise acting to preserve and increase the investors' monies, and, in the process, had diverted approximately $2 million dollars to the personal benefit of FEATHERS and members of his family as well as other unauthorized expenditures.

Over on the civil side, the Commissioner selected the Featherses' returns for audit. Since they were shareholders of SBCC, this included an examination of SBCC's returns. This task posed an unusual challenge because at the time of the audit, the receiver had already

**[\*10]** taken possession of SBCC's records, and the Commissioner had to work with him to get the documents needed to conduct the audit.[12]

These many counts were not put to the test at trial. Mr. Feathers instead pleaded guilty to one count of mail fraud and was sentenced to 33 months in prison. The audit also came to a close after the Commissioner found what he thought was evidence that SBCC had underreported its gross receipts and paid Mr. Feathers consulting fees that the Featherses did not report. He made the following adjustments[13] to their returns:

| Tax Year | Unreported Flowthrough Income from SBCC | Unreported Gross Receipts or Sales from SBCC | Total Adjustment |
|---|---|---|---|
| 2009 | $756,281 | $171,000 | $927,281 |
| 2010 | 232,133 | 102,000 | 334,133 |

The Commissioner issued a notice of deficiency to the Featherses in January 2014. The Featherses filed a timely petition, but trial was delayed by both criminal and bankruptcy proceedings.[14] We finally tried the case after Mr. Feathers was released from custody.

In the lead-up to trial, the Commissioner filed with the Court and served on the Featherses a request for admissions. The Featherses failed to reply to the request within 30 days of receipt. Under Rule 90(c) and (f), this means that we deem all those statements admitted.

---

[12] Mr. Feathers believed that there were 95 boxes of documents that the receiver had in his possession that were not provided to the IRS.

[13] In a separate adjustment of SBCC's 2009 and 2010 returns, the Commissioner made adjustments of $916,131 and $1,707,613, respectively, for underreported gross receipts or sales.

[14] At the time they filed the petition, the Featherses were residents of California. Appellate venue for an appeal would presumptively lie in the Ninth Circuit. *See* § 7482(b)(1)(A).

[*11]                              OPINION

The major disputes here are about whether, and if so in what amounts, Mr. Feathers received taxable income from SBCC. [15]

I.    *Money from the Funds to SBCC*

The passthrough income that the Commissioner attributes to the Featherses stems from what he carefully calls unreported income from the Funds.[16]    The Commissioner used a bank-deposits analysis to determine the income that SBCC received for 2009 and 2010.[17] In a bank-deposits analysis the Commissioner first equates deposits with income, then subtracts any identifiable nontaxable items, deductible expenses, or income that was reported. *See Clayton v. Commissioner*, 102 T.C. 632, 645–46 (1994). A taxpayer's bank deposits are *prima facie* evidence of income and are sufficient to shift the burden of proof away from the Commissioner. *Welch v. Commissioner*, 204 F.3d 1228, 1230

---

[15] The Commissioner made many other adjustments that the Featherses do not challenge.

[16] A determination in a notice of deficiency is presumed correct, but the Ninth Circuit affords the Commissioner this presumption in cases arising from unreported income only "once some substantive evidence is introduced demonstrating that the taxpayer received unreported income." *Delaney v. Commissioner*, 743 F.2d 670, 671 (9th Cir. 1984) (quoting *Edwards v. Commissioner*, 680 F.2d 1268, 1270 (9th Cir. 1982) (*per curiam*), *aff'g* T.C. Memo. 1982-666).  This requires only a "minimal evidentiary foundation."  *See Weimerskirch v. Commissioner*, 596 F.2d 358, 361 (9th Cir. 1979), *aff'g* 67 T.C. 672 (1977); *see also Gardner v. Commissioner*, 845 F.3d 971, 974 (9th Cir. 2017) (applying the Court's reasoning in *Weimerskirch* to unreported income that was generated legally), *aff'g* T.C. Memo. 2013-67.

In *Weimerskirch*, 596 F.2d at 362, the Ninth Circuit stated that "the requirement that there must be some evidentiary foundation linking the taxpayer to the alleged income-producing activity is especially acute where, as here, the government asserts that the taxpayer was engaged in an activity which is otherwise illegal."  Through avoiding characterization of the transfers as illegal activity, the Commissioner steers clear of this ever so slightly higher burden of connecting the income to the income-producing activity which attaches when the alleged income is derived from illegal activity.

[17] In his brief the Commissioner states "Respondent used a combination of the specific-items method and the bank deposits method to determine the unreported income petitioners received from SBCC in 2009 and 2010."  The Featherses argue that this raises a new issue on brief unmentioned before.  It does not.  There are two distinct income issues in this case.  The Commissioner used the bank-deposits analysis to compute the income Mr. Feathers received as passthrough income from SBCC; he used the specific-item method to compute the income Mr. Feathers received from SBCC directly as "consulting" payments.

**[\*12]** (9th Cir. 2000) (citing *Calhoun v. United States*, 591 F.2d 1243, 1245 (9th Cir. 1978)), *aff'g* T.C. Memo. 1998-121.

Hannah Kim was the revenue agent who conducted the bank-deposits analysis in this case. She "relied on bank data including bank statements, deposited slips, deposited check images, and also, Taxpayer records including general ledger, and general entries."[18] If she could trace the movement of the deposits between accounts, she treated the transactions as interaccount transfers and not as taxable income. She also refrained from including any of the money deposited into SBCC's brokerage from the analysis. Her analysis revealed the following:

| Year | *Reported Gross Receipts or Sales* | *Adjusted Gross Receipts or Sales per Bank Deposits Analysis* | *Total Adjustments* |
|---|---|---|---|
| 2009 | $858,839 | $1,774,970 | $916,131 |
| 2010 | 520,232 | 2,227,845 | 1,707,613 |

These adjustments resulted in changes to SBCC's income and in turn the Featherses' passthrough income:

| Year | *SBCC Reported Income* | *SBCC Adjusted Income* | *Featherses' Reported Passthrough Income* | *Featherses' Adjusted Passthrough Income*[19] |
|---|---|---|---|---|
| 2009 | −$427,754 | $488,377 | −$366,445 | $389,836 |
| 2010 | −1,420,795 | 286,818 | — | 232,133 |

Though the bank-deposits analysis was sufficient to establish the minimal evidentiary foundation of income, there is a gap between the amount of income the Commissioner deduced that SBCC had received from the Funds from his bank-deposits analysis for 2009, and the sum he determined in the notice of deficiency. The 2009 bank-deposits analysis concluded that SBCC had $1,654,110 in gross receipts, and $82,310 in rental income not includible on Form 8825, Rental Real Estate Income and Expenses of a Partnership or an S Corporation. Adding these two numbers together leaves us with $1,736,420, which is

---

[18] Agent Kim claims that she referred to the forensic accounting general ledger, but she reached her conclusion from the "bank records and [the] Taxpayer's documents, not [the] forensic accounting general ledger."

[19] Mr. Feathers owned 79.8228% of SBCC shares in 2009 and 80.9339% of the shares in 2010, and this figure is his proportionate share of that passthrough income.

**[*13]** $38,578 less than in the notice of deficiency, requiring a decision under Rule 155.

Other than that we don't see any problems with the Commissioner's numbers for the 2009 tax year, and there is no doubt that he has traced that income from the Funds to SBCC and on to Mr. Feathers.

For 2010 we also have the Commissioner's bank-deposits analysis, which shows more than $2 million in extra income—the same amount that he determined in the notice of deficiency attached then to the exhibit labeled "2009 bank-deposits analysis." Though the Featherses have been deemed to admit these transfers from the Funds to SBCC, they argue in their posttrial brief that the bank-deposits analysis is invalid.

First, they argue that Agent Kim's analysis is unreliable. She testified that she took over the audit from another agent who organized things differently and who came to a conclusion with which she did not agree. The Featherses argue that Agent Kim's adjustment of the Commissioner's findings—which were in their favor—somehow makes her entire analysis invalid. It does not.

They then argue that the government did not provide Agent Kim with information necessary for the analysis, and that it was selective in the information it did provide to her. They specifically cite Agent Kim's testimony that the backs of the checks that she relied on for the specific-item analysis weren't provided for her review. This is just speculation, however. We have no actual evidence that the Commissioner withheld any information from Agent Kim during her review.

Finally, even though Agent Kim testified to not using the audited financial statements, the Featherses contend that the bank-deposits analysis contains reference to "forensic accounting and third-party work product." They didn't raise any objections to entering the forensic accounting into the record at trial, though, and point to no errors in the bank-deposits analysis itself—only that it may or may not have relied on a third party.

We therefore find that money was transferred to SBCC from the Funds:

**[*14]**

| Year | Unreported Gross Transfers from SBC Portfolio | Unreported Gross Transfers from Investors Prime |
|---|---|---|
| 2009 | $545,137 | $609,250 |
| 2010 | 150,513 | 1,106,043 |

Transfers are in themselves not necessarily taxable income. And the Featherses argue that not all these transfers to SBCC were. A minor problem with their argument is that not all the unreported transfers to SBCC came from the Funds. The 2009 bank-deposits analysis revealed a $10,000 deposit from an unidentified source and the 2010 analysis revealed a total of $180,150 in unreported gross receipts from entities named Coastal Capital Income Fund, LLC; Valley Produce; and SBC LLC. The Featherses gave us no explanation for these transfers. The presumption that these deposits are income is unrebutted.

For the rest of the transfers, however, the Featherses do have an argument—they say that the transfers were loans from the Funds to SBCC and thus not taxable.[20]

They first point to SBCC's audited financial statements, which show the transfers under "Consolidated Statement of Cash Flows" as a specific item labeled "*Loaned* to Fund Manager." (Emphasis added.) Labels aren't enough—as the Commissioner correctly points out—and for these transfers to count as loans, we must find that there was an agreement "either express or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree." *Welch*, 204 F.3d at 1230 (quoting *Commissioner v. Valley Morris Plan*, 305 F.2d 610, 618 (9th Cir. 1962) (citations omitted), *rev'g in part* 33 T.C. 572 (1959) *and Morris Plan Co. of Cal. v. Commissioner*, 33 T.C. 720 (1960)).

---

[20] SBCC went into receivership after the years at issue. Mr. Feathers testified that the receiver filed returns for both 2011 and 2012, and that on those returns the receiver reported cancellation-of-indebtedness income stemming from these loans. If true, the Featherses would be correct that imposing a tax on these transfers on the years before us would be the equivalent of taxing the same income twice. The problem is that the Featherses provided us with no documentary evidence of SBCC's 2011 and 2012 returns. The Commissioner notes that the Featherses did not raise the issue of the 2011 and 2012 returns until the day before trial, and did not produce these returns or request their production in discovery.

**[\*15]** The Ninth Circuit has recognized seven factors that show a *bona fide* loan:

- whether the promise to repay is evidenced by a note or other instrument;

- whether interest was charged;

- whether a fixed schedule for repayments was established;

- whether collateral was given to secure payment;

- whether repayments were made;

- whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and

- whether the parties conducted themselves as if the transaction were a loan.

*Id.*

These factors are not exclusive, and no single factor is dispositive. *Id.*; *see also Dixie Dairies Corp. v. Commissioner*, 74 T.C. 476, 493 (1980) (citing *John Kelley Co. v. Commissioner*, 326 U.S. 521, 530 (1946)).

Our analysis hinges on "whether there was an intent to create a debt with a reasonable expectation of repayment and, if so, whether that intent comports with the economic reality of creating a debtor-creditor relationship." *Delta Plastics, Inc.*, 85 T.C.M. (CCH) 940, 943 (2003) (citing *Litton Bus. Sys., Inc. v. Commissioner*, 61 T.C. 367, 377 (1973)); *accord Estate of Chism v. Commissioner*, 322 F.2d 956, 960 (9th Cir. 1963), *aff'g Chism Ice Cream Co. v. Commissioner*, 21 T.C.M. (CCH) 25 (1962).[21] Whether a transfer of money constitutes a loan is "determined

---

[21] The Featherses argue that the Commissioner cannot speculate as to SBCC's and the Funds' state of mind at the time of the conveyance since "[p]etitioner's state of mind during trial" was never at issue. The issue before us is what the evidence shows us about SBCC's and the Funds' intent at the time of the transfers. The Commissioner asked quite a few questions of Mr. Feathers about that issue, such as the terms of the loans, the time the notes were executed, and whether a loan existed at the time that the money was conveyed. There is plenty of objective evidence in the Commissioner's favor here. *See Keogh v. Commissioner*, 713 F.2d 496, 502 (9th Cir. 1983) ("The tax court is not obliged to believe a taxpayer's testimony rather than evidence introduced by the Commissioner").

**[\*16]** upon consideration of all the circumstances present in a particular case, and depends upon the existence of an intent at the time the [transfer] is made that it should be paid back." *Estate of Chism*, 322 F.2d at 960 (quoting *Clark v. Commissioner*, 266 F.2d 698, 710–11 (9th Cir. 1959), *remanding* T.C. Memo. 1957-129).

Here, the Funds issued three notes to SBCC, one from SBC Portfolio, and the other two from Investors Prime.

| Lender | Date of Note | Principal Amount | Maturity |
|---|---|---|---|
| Investors Prime | January 1, 2011 | $1,850,000[22] | 1/1/2016 |
| SBC Portfolio | January 1, 2011 | 707,464 | 1/1/2016 |
| Investors Prime | January 1, 2011 | 5,000,000 | 1/1/2016 |

The notes all included an interest rate of 7.5% and called for quarterly payments of interest with a balloon payment of the principal on demand or on the notes' termination dates. But only one of the notes spelled out these dates with specificity and was backed by collateral.

These absences weigh against a finding that they were *bona fide* loans. But there is an even bigger problem: All the notes were executed in 2011, the year *after* the money at issue had been transferred from the Funds to SBCC. This means that they tell us little about what the parties' intent was at the time that the money was transferred.

The Featherses provide us with no evidence that *at the time the money was transferred* to SBCC, interest was charged, the loans were secured by collateral, or there was a fixed repayment schedule. We also have no evidence that SBCC made payments on the notes, that the Funds charged late fees, or whether the Funds tried to collect the full amount or any portion of the notes after each default by SBCC. In his own testimony, Mr. Feathers admitted that at the time it was transferred from the Funds to SBCC, at least a portion of the money was not intended as a loan, but as reimbursements for expenses that SBCC incurred while managing the Funds. He stated that they did not metamorphize into loans until the Funds' investors approved the amendment to the operating agreements which would allow for the loans.

---

[22] Though the note on this was dated January 1, 2011, the note explicitly states that "Lender has advanced to Borrower the sum of $1,850,000 (One Million Eight Hundred Fifty Thousand Dollars) as of December 31, 2010."

**[\*17]** As for the final factor, we assess whether the ability to repay a loan is "a reasonable expectation of repayment in light of the economic realities of the situation." *Fisher v. Commissioner*, 54 T.C. 905, 910 (1970). SBCC purportedly owed the following to Investors Prime and SBC Portfolio at the end of 2009 and 2010:

| Year | SBC Portfolio | Investors Prime |
|------|---------------|-----------------|
| 2009 | $534,736 | $51,461 |
| 2010 | 713,791 | 1,500,000 |

These amounts themselves are large relative to SBCC's income, which was only roughly $700,000 in 2009 and in 2010—it was operating in the red both years and reported a total loss of $1,500,000. The size of the loans compared to SBCC's shrinking income indicates that SBCC was not in a financial position to be able to repay.[23] The Featherses assert that the numerous benefits associated with obtaining the SBLC license would mean that SBCC would become profitable. There is a chance that the profitability of SBCC would have increased—but that reasoning is speculative at best.

That leaves us to find little if any reason to believe that these transfers were loans. Nearly all the factors that the Ninth Circuit instructs us to analyze point to the nonexistence of a loan. The only factor that could arguably be in the Featherses favor—the promise to repay being evidenced by a note—is weak at best because of the three notes' attempted *ex post facto* execution. Because of this, we agree with the Commissioner and find it more likely than not that the transfers of money from the Funds to SBCC were not loans.

II. *Money from SBCC to the Featherses*

Agent Kim also looked for additional income Mr. Feathers received from SBCC. She found some amounts that SBCC deducted for consulting, as well as amounts that according to the company's ledger were paid to Mr. Feathers for consulting. We'll go through the

---

[23] Remember that we look at the time that the money was transferred when determining whether the reasonable expectation of repayment existed. The transfers that the Featherses characterize as loans took place in 2009 and 2010, though they were not documented until 2011. The income on the returns may not give us an indication of the financial health of SBCC at the specific time that each of the transfers were made, but they do give us insight into the direction in which the company was headed.

**[\*18]** conclusions that she drew from this "specific-item analysis" and the Featherses' challenge to it. And then we'll briefly discuss an anomaly in comparing this analysis to the notice of deficiency.

###### A. *Specific-Item Analysis*

To lay the Ninth Circuit's required "minimal evidentiary foundation" for unreported income, Agent Kim used a specific-item method of reconstructing the Featherses' income received from SBCC in 2009 and 2010. This meant she looked at "evidence of particular or specific amounts of taxable income received by the taxpayer during a particular tax period, with evidence that the taxpayer did not include such amounts in his tax return for such period." *See Estate of Beck v. Commissioner*, 56 T.C. 297, 353 (1971).

She noticed that SBCC had deducted commission fees paid to Mr. Feathers, and the corporation's general ledger clearly identified the check numbers and the name of the recipient. These matched SBCC's tax returns and the amounts the corporation had deducted. She calculated that SBCC paid Mr. Feathers $171,000 in such fees in 2009 and $165,000 in 2010.

She then noticed that the Featherses had failed to report all these fees on their returns for 2009 and 2010. We summarize:

| Tax Period | Per Return | Per Exam | Adjustment |
|------------|-----------|----------|------------|
| 2009 | — | $171,000 | $171,000 |
| 2010 | $63,000 | 165,000 | 102,000 |

The Featherses disputed neither that Mr. Feathers received those checks nor that they were income. The Featherses also failed to deny the Commissioner's requests that they admit these deposits were taxable. This is yet another grounds for finding for the Commissioner. *See Delaney v. Commissioner*, 743 F.2d at 672. Mr. Feathers even conceded that some of the checks written by SBCC "were to Mark Feathers and those [he doesn't] argue were for [his] sole-proprietorship [so long as] they were reflected as such on the footnote to those checks as consulting fees." Since the Featherses present no argument that

**[\*19]** money received in their account from SBCC was anything other than consulting fees, we find that the transfers were taxable income.[24]

### B.   *Audit Inconsistencies*

One oddity in the evidence is that the sum of the checks for 2010 that the Commissioner put into the record shows that SBCC transferred more than $200,000 to the Featherses. This includes a number of checks made out to Mr. Feathers that have "consulting" in the memo line; as well as checks for $10,000 and $20,000 with no notation; a $5,000 check to Mr. Feathers with "advanced pay" in the memo line; and a $5,000 consulting fee to SB Capital (the sole proprietorship).

This is more than the amount that the Commissioner used when he computed the deficiency for that year. The Commissioner never asked us to find a higher deficiency than that in his notice, though. We are therefore limited to that initial adjustment, *see* § 6214(a), and find these are the total amounts paid out to Mr. Feathers from SBCC as additional income:

| Year | Deposit Totals |
|------|----------------|
| 2009 | $171,000 |
| 2010 | 165,000 |

## III.   *Penalties*

### A.   *Section 6662(a)*

Section 6662(a) and (b)(2) imposes a 20 percent penalty for underpayments due to "[a]ny substantial understatement of income

---

[24] Mr. Feathers introduced some confusion about this analysis. He had SBCC set up a trust account titled SB Capital, the same d.b.a. that SBCC used in its business. He said that SBCC used this account to hold funds in trust when a borrower was waiting for an appraisal and environmental review of a property. "SB Capital" was also, as we mentioned above, the name of Mr. Feathers's sole proprietorship. This led him to complain that the Commissioner was including in his analysis checks written to SB Capital from the trust account as if they belonged to him when they in fact were SBCC's funds. He surmised that the Commissioner was mistakenly including this money as income of his sole proprietorship.

We disagree. The checks that the Commissioner introduced into evidence and that were made payable to "Mark Feathers" add up to more than the total unreported consulting income that he used to determine the Featherses' deficiency.

[*20] tax." Though the Commissioner initially sought penalties for both 2009 and 2010, he later dropped his push for a penalty for 2010.

The Commissioner has both a burden of proof and a burden of production here. Whether the Commissioner met his burden of production in this case is a simple math problem. An understatement of tax is "substantial" if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return." § 6662(d)(1)(A). In 2009, the tax required to be shown on the Featherses' return is about $212,278, and the Featherses reported no liability on their return—this difference is much greater than the 10 percent the Commissioner needs to satisfy this burden.

His burden of proof is to show that he complied with section 6751. A group manager approved in writing the determination by Revenue Agent Thien Tran—the first revenue agent to work on the audit—to impose an accuracy-related penalty on the ground of substantial understatement of income tax on December 11, 2013. The notice of deficiency was issued on January 13, 2014. Given our recent holding that, for deficiency cases appealable to the Ninth Circuit, the Commissioner satisfies section 6751 if he can show written supervisory approval that occurred before assessment or, if earlier, before the supervisor lost discretion to approve the penalty, we find the Commissioner has met his burden. *See Kraske v. Commissioner*, No. 27574-15, 161 T.C. (Oct. 26, 2023) (applying *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020), and *Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd,* 445 F.2d 985 (10th Cir. 1971)).[25]

We also note that the Featherses are deemed to have admitted liability for the penalty.

---

[25] Though the section 6662(a) penalty does allow for an exception in the case of a taxpayer who claimed a deduction reasonably and in good faith, *see* § 6664, the Featherses did not argue for this at trial or on brief. Mr. Feathers did testify that he had help preparing his taxes from an accounting firm. An accountant named Dennis Young prepared the returns for the years at issue, but Mr. Feathers could not remember with certainty the name of the firm that Mr. Young worked for. Mr. Feathers did testify that the accountants would come to the firm, spend some time on the computer, and would download "whatever they asked for." We cannot find on the basis of this thin testimony that the accountants were provided with all the information necessary to prepare the returns or even that the accountants were qualified.

**[\*21]**  B.  *Section 6651(a)(1)*

Under section 6651(a) a taxpayer is liable for an addition to tax if he fails to file a timely tax return.  The Featherses did not file their 2009 return until March 2011 and did not file their 2010 return until May 2013.  Both returns were therefore late.

The Featherses presented no arguments or evidence to suggest that their late filing was unavoidable in the face of their exercise of ordinary business care and prudence.  We also have to deem admitted their liability for these additions to tax.  Both are sufficient grounds to sustain the Commissioner.

IV.  *Conclusion*

The Featherses failed to report Mr. Feathers's share of SBCC's underreported income.  They also failed to report the consulting income that Mr. Feathers received from SBCC.  We also find for the Commissioner for the section 6662(a) penalty for 2009 as well as the section 6651(a)(1) additions to tax for 2009 and 2010.  But although we find in the Commissioner's favor on almost all points, it is still necessary that

*Decision will be entered under Rule 155.*